Flaum, Circuit Judge.
Rickey I. Kanter pleaded guilty to one count of mail fraud under 18 U.S.C. § 1341. Due to his felony conviction, he is prohibited from possessing a firearm under both federal and Wisconsin law. At issue in this case is whether the felon dispossession statutes- 18 U.S.C. § 922(g)(1) and Wis. Stat. § 941.29(1m) -violate the Second Amendment as applied to Kanter. Even if Kanter could bring an *439 as-applied challenge, the government has met its burden of establishing that the felon dispossession statutes are substantially related to an important government interest. We therefore affirm the district court.
I. Background
A. Federal and Wisconsin Felon Dispossession Statutes
Section 922(g)(1) prohibits firearm possession by persons convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). State misdemeanors are included under the statute if they are punishable by more than two years in prison.[1] Id. § 921(a)(20)(B). However, the statute excludes anyone convicted of "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." Id. § 921(a)(20)(A). Moreover, "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored" is not a conviction for purposes of the statute. Id. § 921(a)(20).
Although the firearms prohibition generally applies for life, the statute includes a "safety valve" that permits individuals to apply to the Attorney General for restoration of their firearms rights. Logan v. United States, 552 U.S. 23, 28 n.1, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007). Specifically, the Attorney General[2] may remove the prohibition on a case-by-case basis if an applicant sufficiently establishes "that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c).
Since 1992, however, "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications,' " rendering the provision "inoperative." Logan, 552 U.S. at 28 n.1, 128 S.Ct. 475 (quoting United States v. Bean, 537 U.S. 71, 74-75, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002) ). The Committee on Appropriations eliminated funding because the restoration procedure under § 925(c) was "a very difficult task" that required ATF officials to "spend many hours investigating a particular applicant for relief." H.R. Rep. No. 102-618, at 14 (1992). Even then, there was "no way to know with any certainty whether the applicant [was] still a danger to public safety." Id. Accordingly, ATF officials were effectively "required to guess whether a convicted felon ... [could] be entrusted with a firearm." Id. Moreover, they were "forced to make these decisions knowing that a mistake could have devastating consequences for innocent citizens." Id. Ultimately, the Committee determined that "the $3.75 million and the 40 man-years annually spent investigating and acting upon these applications for relief would be better utilized by ATF in fighting violent crime." Id. The Committee addressed the funding issue again in 1995, adding that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." H.R. Rep. No. 104-183, at 15 (1995).
*440 In 1981, Wisconsin adopted its own felon dispossession law. See Wis. Stat. § 941.29(1m). Section 941.29(1m) prohibits an individual from possessing a firearm if he has "been convicted of a felony in" Wisconsin or "a crime elsewhere that would be a felony" in Wisconsin. Id. § 941.29(1m)(a)-(b).
B. Factual Background
Kanter lives in Mequon, Wisconsin. He was previously the owner, operator, and CEO of Rikco International, LLC. Rikco International, which did business as "Dr. Comfort," manufactured therapeutic shoes and inserts for individuals with diabetes and severe foot disease. The company marketed the shoes and inserts to podiatrists, who in turn sold them to individual consumers. Most of the shoes and inserts were billed to, and paid for by, Medicare. Medicare only paid for inserts that met certain thickness and hardness standards.
In April 2004, Kanter submitted his inserts to Medicare to determine whether they met those requirements. Medicare rejected Kanter's inserts because they were too thin. Kanter then submitted revised samples, which Medicare approved. However, Kanter continued to sell the noncompliant inserts while representing that they were Medicare-approved. All told, Medicare paid Kanter's company $375,000 for the noncompliant inserts.
On May 24, 2011, Kanter pleaded guilty to one count of mail fraud under 18 U.S.C. § 1341 based on a shipment of the noncompliant inserts to a podiatrist in Florida. Section 1341 carries a maximum penalty of twenty years in prison and a $250,000 fine. Kanter was sentenced to one year and one day in prison and two years of supervised release. He was also ordered to pay a criminal penalty of $50,000, and he reimbursed Medicare over $27 million in a related civil settlement.
Kanter has since served his time and paid his criminal penalty, and he has not been charged with any additional criminal activity. However, because of his felony conviction, he is permanently prohibited from owning a firearm under federal and Wisconsin law.
C. Procedural Background
Kanter brought suit in the Eastern District of Wisconsin, arguing that 18 U.S.C. § 922(g)(1) and Wis. Stat. § 941.29(1m) are unconstitutional under the Second Amendment as applied to him. The United States moved to dismiss his claim under Rule 12(b)(6), and Wisconsin moved for judgment on the pleadings under Rule 12(c). In response, Kanter moved for summary judgment, arguing that his status as a nonviolent offender with no other criminal record meant that both statutes were unconstitutional as applied to him.
The district court granted defendants' motions and denied Kanter's motion. In so doing, the district court held that, even assuming felons are entitled to Second Amendment protection, the application of the federal and Wisconsin felon dispossession laws to Kanter is substantially related to the government's important interest in preventing gun violence. The court reasoned that Congress and the Wisconsin legislature are entitled to categorically disqualify all felons-even nonviolent felons like Kanter-because both have found that such individuals are more likely to abuse firearms. The court also noted that this "bright line categorical approach ... allows for uniform application and ease of administration." The district court entered judgment on January 2, 2018, and this appeal followed.
II. Discussion
We review de novo a district court's ruling on a motion to dismiss for *441 failure to state a claim and a motion for judgment on the pleadings. Landmark Am. Ins. Co. v. Hilger , 838 F.3d 821, 824 (7th Cir. 2016). In doing so, "we accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." Roberts v. City of Chicago , 817 F.3d 561, 564 (7th Cir. 2016). To avoid dismissal, "the complaint must 'state a claim to relief that is plausible on its face.' " Id. (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).
A. Legal Standard[3]
The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In District of Columbia v. Heller , the Supreme Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 634-35, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Accordingly, the Court concluded that Washington D.C.'s ban on handgun possession in the home violated the Second Amendment. Id. at 635, 128 S.Ct. 2783.
However, the Court also made clear that "the right secured by the Second Amendment is not unlimited." Id. at 626, 128 S.Ct. 2783. Although the Court did not "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," it said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." Id. It described such prohibitions as "presumptively lawful regulatory measures." Id. at 627 n.26, 128 S.Ct. 2783. Two years later, in McDonald v. City of Chicago , the Court "repeat[ed] [its] assurances" that felon dispossession laws remain valid. 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion).
After Heller , we developed a two-step test for Second Amendment challenges. "The threshold question is whether the regulated activity falls within the scope of the Second Amendment." Ezell v. City of Chicago , 846 F.3d 888, 892 (7th Cir. 2017) (" Ezell II "). "This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.' " Id. (quoting Ezell v. City of Chicago , 651 F.3d 684, 703 (7th Cir. 2011) (" Ezell I ")).
However, "if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected[,] then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." Id. (quoting Ezell I , 651 F.3d at 703 ). At step two, we evaluate "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." Id. (quoting Ezell I , 651 F.3d at 703 ). The rigor of the review is dependent on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Id. (quoting Ezell I , 651 F.3d at 703 ). "Severe burdens" on this core right "require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the *442 margins of the right, are more easily justified." Id. The government has the burden "of justifying its law under a heightened standard of scrutiny; rational-basis review does not apply." Id. We have consistently described step two as "akin to intermediate scrutiny" and have required the government to show that the challenged statute is substantially related to an important governmental objective. United States v. Meza-Rodriguez , 798 F.3d 664, 672 (7th Cir. 2015) (citing cases).
B. As-Applied Second Amendment Challenges
Relying on the "presumptively lawful" language in Heller and McDonald , every federal court of appeals to address the issue has held that § 922(g)(1) does not violate the Second Amendment on its face. See, e.g. , United States v. Davis , 406 F. App'x 52, 53-54 (7th Cir. 2010) ; United States v. Bogle , 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam); United States v. Moore , 666 F.3d 313, 318-19 (4th Cir. 2012) ; United States v. Barton , 633 F.3d 168, 172 (3d Cir. 2011), overruled on other grounds by Binderup v. Att'y Gen. , 836 F.3d 336 (3d Cir. 2016) (en banc); Schrader v. Holder , 704 F.3d 980, 989-91 (D.C. Cir. 2013), cert. denied , 571 U.S. 989, 134 S.Ct. 512, 187 L.Ed.2d 365 (2013) ; United States v. Joos , 638 F.3d 581, 586 (8th Cir. 2011) ; United States v. Khami , 362 F. App'x 501, 508 (6th Cir. 2010), cert. denied , 560 U.S. 934, 130 S.Ct. 3345, 176 L.Ed.2d 1238 (2010) ; United States v. Battle , 347 F. App'x 478, 480 (11th Cir. 2009) (per curiam); United States v. McCane , 573 F.3d 1037, 1047 (10th Cir. 2009), cert. denied , 559 U.S. 970, 130 S.Ct. 1686, 176 L.Ed.2d 179 (2010) ; United States v. Smith , 329 F. App'x 109, 110-11 (9th Cir. 2009) ; United States v. Anderson , 559 F.3d 348, 352 (5th Cir. 2009).
However, courts of appeals are split as to whether as-applied Second Amendment challenges to § 922(g)(1) are viable. On the one hand, the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have suggested that § 922(g)(1) is always constitutional as applied to felons as a class, regardless of their individual circumstances or the nature of their offenses. See Stimmel v. Sessions , 879 F.3d 198, 210 (6th Cir. 2018) ("[W]e have upheld § 922(g)(1), which disarms even non-violent felons." (citing United States v. Carey , 602 F.3d 738, 741 (6th Cir. 2010), cert. denied , 562 U.S. 895, 131 S.Ct. 322, 178 L.Ed.2d 145 (2010) )); United States v. Scroggins , 599 F.3d 433, 451 (5th Cir. 2010), cert. denied , 562 U.S. 867, 131 S.Ct. 158, 178 L.Ed.2d 95 (2010) (rejecting as-applied Second Amendment challenge and holding that felon dispossession laws are constitutional even if the offense was nonviolent in nature); United States v. Rozier , 598 F.3d 768, 771 (11th Cir. 2010), cert. denied , 560 U.S. 958, 130 S.Ct. 3399, 177 L.Ed.2d 313 (2010) (concluding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not of-fend the Second Amendment," and holding that § 922(g)(1) is "a constitutional avenue to restrict the Second Amendment right of certain classes of people," including convicted felons); United States v. Vongxay , 594 F.3d 1111, 1115 (9th Cir. 2010), cert. denied , 562 U.S. 921, 131 S.Ct. 294, 178 L.Ed.2d 193 (2010) (rejecting nonviolent felon's as-applied Second Amendment challenge to § 922(g)(1) because "felons are categorically different from the individuals who have a fundamental right to bear arms"); In re U.S. , 578 F.3d 1195, 1200 (10th Cir. 2009) ("We have already rejected the notion that Heller mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." (citing McCane , 573 F.3d at 1047 )).
*443 The First Circuit has not foreclosed as-applied challenges, but it has expressed some skepticism about them. In United States v. Torres-Rosario , the court rejected the defendant's as-applied challenge because he had two prior convictions for "serious drug offenses." 658 F.3d 110, 113 (1st Cir. 2011), cert. denied , 565 U.S. 1271, 132 S.Ct. 1766, 182 L.Ed.2d 549 (2012). However, the court noted that the Supreme Court "may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," and "might even be open to highly fact-specific objections." Id. Yet the First Circuit cautioned that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." Id.
On the other hand, we, along with the Fourth, Eighth, and D.C. Circuits, have left room for as-applied challenges to the statute. See United States v. Williams , 616 F.3d 685, 693 (7th Cir. 2010), cert. denied , 562 U.S. 1092, 131 S.Ct. 805, 178 L.Ed.2d 532 (2010) ("[W]e recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent."); Medina v. Whitaker , 913 F.3d 152, 160 (D.C. Cir. 2019) ("We need not decide today if it is ever possible for a convicted felon to show that he may still count as a 'law-abiding, responsible citizen' " entitled to Second Amendment protections.); United States v. Woolsey , 759 F.3d 905, 909 (8th Cir. 2014) ("[T]he Eighth Circuit has left open the possibility that a person could bring a successful as-applied challenge to § 922(g)(1)" but rejected defendant's as-applied challenge because he had multiple violent felony convictions.); United States v. Pruess , 703 F.3d 242, 247 (4th Cir. 2012) (holding that § 922(g)(1) could constitutionally be applied to nonviolent felons, but acknowledging that "there in theory might be an as-applied Second Amendment challenge to [§] 922(g)(1) that could succeed" (citations and internal quotation marks omitted)).
Neither we, nor the Fourth, Eighth, or D.C. Circuits, however, have ever actually upheld such a challenge in practice. In fact, we have repeatedly rejected as-applied Second Amendment challenges to § 922(g). See Baer v. Lynch , 636 F. App'x 695, 698 (7th Cir. 2016) (holding that § 922(g)(1) could constitutionally be applied to individual convicted of felony robbery); United States v. Shields , 789 F.3d 733, 750-51 (7th Cir. 2015) (concluding that § 922(g)(1) was constitutional as applied to individual who had been convicted of three violent felonies); Williams , 616 F.3d at 693-94 (holding that § 922(g)(1) was constitutional as applied to individual convicted of felony robbery who "beat[ ] the victim so badly that the victim required sixty-five stitches"); United States v. Skoien , 614 F.3d 638, 642, 644 (7th Cir. 2010) (en banc) (rejecting as-applied Second Amendment challenge to § 922(g)(9) brought by domestic violence misdemeanant because violence was "an element of the offense" and data suggested high rates of recidivism).
Indeed, only one federal court of appeals has upheld an as-applied Second Amendment challenge to § 922(g). In a fractured en banc decision, a narrow majority of the Third Circuit (eight out of fifteen judges) held that § 922(g)(1) was unconstitutional as applied to two individuals convicted of a misdemeanor for corrupting a minor and a misdemeanor for unlawfully carrying a handgun without a license, respectively. Binderup , 836 F.3d at 340, 356. Because it is the only successful as-applied Second Amendment challenge in a court of appeals to date-and because Kanter relies heavily *444 upon it-it is worth examining the case at some length.
Seven members of the Third Circuit reasoned that the historical justification for disarming felons was "tied to the concept of a virtuous citizenry," and that "persons who have committed serious crimes forfeit the right to possess firearms much the way they forfeit other civil liberties." Id. at 348-49 (plurality opinion) (citations and internal quotation marks omitted). Applying the civic virtue rationale, three of those judges concluded that the challengers' offenses "were not serious enough to strip them of their Second Amendment rights." Id. at 351. They explained that, although the two offenses were punishable by more than a year in prison, and thus met the definition of a felony in § 922(g), the state legislatures had enacted them as misdemeanors, and "a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying." Id. Those judges also considered that neither of the offenses at issue involved violence and that each of the challengers received "a minor sentence," and they pointed to the lack of a "cross-jurisdictional consensus regarding the seriousness of the [c]hallengers' crimes," remarking that in some states the challengers' conduct was not even illegal. Id. at 352. At step two, those three judges concluded that § 922(g)(1) did not survive intermediate scrutiny because the government relied on "off-point statistical studies" that involved incarcerated felons, not misdemeanants who had served no jail time. Id. at 354.
By contrast, the other five judges who upheld the as-applied challenge believed that the exclusion of felons from the scope of the Second Amendment's protections was not rooted in notions of civic virtue, but rather "the time-honored principle that the right to keep and bear arms does not extend to those likely to commit violent offenses." Id. at 367 (Hardiman, J., concurring in part and concurring in the judgments). Applying dangerousness as the touchstone, those judges concluded that persons like the challengers who were convicted of nonviolent offenses fall within the scope of the Second Amendment's protection. Id. at 375-76. Moreover, those five judges believed that § 922(g) was "categorically unconstitutional" when applied to "non-dangerous persons convicted of offenses unassociated with violence," such that any subsequent means-end scrutiny or judicial interest balancing was "inappropriate." Id. at 358, 378.
The seven dissenting judges concluded that as-applied challenges to § 922(g)(1) are never permissible. Id. at 401 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments). In doing so, they stressed that the majority's decision to uphold such a challenge was unprecedented. See id. at 380-81 ("The plaintiffs ask us to do something that no federal appellate court has done before.... No federal appellate court has yet upheld a challenge, facial or as-applied, to the felon-in-possession statute."). They criticized the majority's approach because it "saddle[s] district court judges with a seemingly unending obligation to review as-applied challenges" and "fail[s] to provide us with any workable standards that would make such a regime administratively feasible or doctrinally coherent." Id. at 380. According to the dissent, the challengers' claim failed at step one because " Heller itself tells us that felons are disqualified from exercising their Second Amendment rights," and "there is no principled basis ... for distinguishing felons from misdemeanants who commit crimes punishable by more than two years in prison." Id. at 388. In any event, the dissenting judges concluded that § 922(g)(1)
*445 survives intermediate scrutiny because the government's studies established a link between past criminal conduct and the government's important interest in preventing future gun violence. See id. at 400-01. With respect to plaintiffs' contention that the studies were not tailored to their specific characteristics, the dissenting judges explained that "[t]he question is not whether someone exactly like the plaintiffs poses a threat to public safety," but rather "whether the fit between the challenged regulation and the asserted objective [is] reasonable, not perfect." Id. at 400 (alteration in original) (citation and internal quotation marks omitted).[4]
With this background in mind, we now apply our two-step test to this case.
C. Step One: The Historical Evidence is Inconclusive as to Whether Felons Were Categorically Excluded From the Second Amendment's Scope
The first question is whether nonviolent felons as a class historically enjoyed Second Amendment rights. Heller did not answer this question. True, "some of Heller 's language does link Second Amendment rights with the notion[ ] of 'law-abiding citizens.' " Meza-Rodriguez , 798 F.3d at 669 ; see also Heller , 554 U.S. at 634-35, 128 S.Ct. 2783 (observing that the "core" of the Second Amendment right is "the right of law-abiding , responsible citizens to use arms in defense of hearth and home" (emphasis added)). The Heller Court also cautioned that nothing in its decision "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which it referred to as "presumptively lawful." 554 U.S. at 626-27 & n.26, 128 S.Ct. 2783. Moreover, the Court mentioned that certain individuals may be "disqualified from the exercise of Second Amendment rights." Id. at 635, 128 S.Ct. 2783. However, the Court never actually addressed the historical pedigree of felon dispossession laws. Accordingly, we have refused to read too much into the Court's "precautionary language." Skoien , 614 F.3d at 640 ; see also Meza-Rodriguez , 798 F.3d at 669 ("We are reluctant to place more weight on these passing references than the Court itself did.").[5]
Nor has the Seventh Circuit decided whether felons were historically outside the scope of the Second Amendment's protection. See Baer , 636 F. App'x at 698. Although the litigants in Williams raised that question, we declined to address it and proceeded directly to the intermediate scrutiny analysis. 616 F.3d at 692. In so doing, we noted that "[t]he academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is 'inconclusive at best,' and we refrain[ed] ... from making a determination based on contradictory views." Id. (quoting Skoien , 614 F.3d at 650 (Sykes, J., dissenting)).
To be sure, although we have not expressly decided this issue before, we have suggested that felons were not historically understood to have Second Amendment rights. For example, in Skoien , which involved *446 domestic violence misdemeanants, we explained that some "categorical limits" on firearm possession were "part of the original meaning" of the Second Amendment. 614 F.3d at 640. Similarly, in UnitedStates v. Yancey , we opined that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens,' " including felons. 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) (quoting Vongxay , 594 F.3d at 1118 ).[6]
If, as we suggested in Yancey and as most scholars have concluded, the founders conceived of the right to bear arms as belonging only to virtuous citizens, even nonviolent felons like Kanter would fall outside the scope of the Second Amendment. Indeed, several courts of appeals have concluded that nonviolent felons are outside the scope of the Second Amendment. For example, in Hamilton v. Pallozzi , the Fourth Circuit rejected a nonviolent felon's as-applied Second Amendment challenge to a state felon dispossession statute, holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for purposes of the Second Amendment." 848 F.3d 614, 626 (4th Cir. 2017). Explaining that the defendant could not rebut the presumption that he fell outside the category of " 'law-abiding, responsible citizens,' " the court focused on his felony conviction for fraud and theft crimes: "Theft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law." Id. at 627 (quoting Heller , 554 U.S. at 635, 128 S.Ct. 2783 ); see also Medina , 913 F.3d at 160 ("Whether a certain crime removes one from the category of 'law-abiding and responsible,' in some cases, may be a close question," such as "a misdemeanor arising from a fistfight .... Those who commit felonies however, cannot profit from our recognition of such borderline cases."); United States v. Hughley , 691 F. App'x 278, 279 (8th Cir. 2017) (per curiam) ("Restricting gun possession by felons-even nonviolent ones-differs meaningfully from restricting citizens who have not been convicted of serious offenses from having guns in their home for self-defense."); Vongxay , 594 F.3d at 1115-16 ("declin[ing] to make a *447 distinction between violent and non-violent felons" because "felons are categorically different from the individuals who have a fundamental right to bear arms"); Rozier , 598 F.3d at 771 & n.5 (stating that a nonviolent felon's "Second Amendment right to bear arms is not weighed in the same manner as that of a law-abiding citizen" and analogizing felon-dispossession statutes to felon disenfranchisement laws); United States v. Everist , 368 F.3d 517, 519 (5th Cir. 2004) ("Irrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens.").[7]
On the other hand, as Judge Sykes observed in her dissent in Skoien , there is scholarly "disagree[ment] about the extent to which felons ... were considered excluded from the right to bear arms during the founding era," and "[t]he historical evidence is inconclusive at best." Skoien , 614 F.3d at 650 (Sykes, J., dissenting) (emphasis omitted).[8] If the founders were really just concerned about dangerousness, not a lack of virtue, nonviolent felons like Kanter arguably fall within the scope of the Second Amendment's protections.
Ultimately, we need not resolve this difficult issue regarding the historical scope of the Second Amendment to dispose of this case. Instead, we proceed to the means-end scrutiny of the government's objectives.[9]
D. Step Two: The Felon Dispossession Statutes Survive Intermediate Scrutiny
Categorical prohibitions on the possession of firearms by felons are "presumptively lawful," even in disqualifying nonviolent felons like Kanter. See *448 Skoien , 614 F.3d at 640 ("[S]uch a recent extension of [ § 922(g)(1) 's] disqualification to non-violent felons (embezzlers and tax evaders, for example) is presumptively constitutional, as Heller said in note 26."). But because " Heller referred to felon disarmament bans only as 'presumptively lawful,' " we require the government to "prov[e] 'the constitutionality of § 922(g)(1)... using the intermediate scrutiny framework.' " Williams , 616 F.3d at 692.
To survive intermediate scrutiny at step two, the government must show that the felon dispossession statute is substantially related to an important governmental objective. Consistent with how we apply intermediate scrutiny in the First Amendment context, the "fit" between the challenged regulation and the asserted governmental objective need only "be reasonable, not perfect." United States v. Marzzarella , 614 F.3d 85, 98 (3d Cir. 2010) ; cf. FTC v. Trudeau , 662 F.3d 947, 953 (7th Cir. 2011).[10]
The government has met its burden in this case. First, Kanter concedes that the government's objective in passing § 922(g)(1) was an important one. The government identifies its interest as preventing gun violence by keeping firearms away from persons, such as those convicted of serious crimes, who might be expected to misuse them. This formulation of the government's interest is consistent with our precedent in this area. See Yancey , 621 F.3d at 683 ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people."); Williams , 616 F.3d at 693 (describing the government's objective as "keep[ing] firearms out of the hands of violent felons, who the government believes are often those most likely to misuse firearms"); Skoien , 614 F.3d at 642 (describing the government's interest as "preventing armed mayhem"). And we have previously held that this interest is "without doubt an important one." Yancey , 621 F.3d at 684 ; see also Meza-Rodriguez , 798 F.3d at 673 ("[T]he government has a[ ] strong interest in preventing people who already have disrespected the law (including ... felons ...) from possessing guns.").
Second, the government has shown that prohibiting even nonviolent felons like Kanter from possessing firearms is substantially related to its interest in preventing gun violence. Before turning to the government's statistical evidence establishing such a link, it is important to note that we do not write on a blank slate. In Yancey , we explained that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. In fact, the D.C. Circuit has concluded that "nonviolent offenders not only have a higher recidivism rate than the general population, but certain groups-such as property offenders-have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent." Kaemmerling v. Lappin , 553 F.3d 669, 683 (D.C. Cir. 2008) ; see *449 Ewing v. California , 538 U.S. 11, 26, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (citing P. Langan & D. Levin, U.S. Dep't of Justice, Bureau of Justice Statistics, Special Report: Recidivism of Prisoners Released in 1994 , at 1 (June 2002)).
In addition to these judicial statements, the government points to several studies that have found a connection between nonviolent offenders like Kanter and a risk of future violent crime. For example, one study of 210,886 nonviolent offenders found that about one in five were rearrested for a violent crime within three years of his or her release. See U.S. Dep't of Justice, Bureau of Justice Statistics Profile of Nonviolent Offenders Exiting State Prisons 2, 4 (2004). A separate study found that 28.5 percent of nonviolent property offenders-a category that includes fraud convictions-were rearrested for a violent offense within five years of their release. See Matthew R. Durose, et al. , U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010 , at 9 (2014). Yet another study found that "even handgun purchasers with only 1 prior misdemeanor conviction and no convictions for offenses involving firearms or violence were nearly 5 times as likely as those with no prior criminal history to be charged with new offenses involving firearms or violence." Garen J. Wintemute, et al. , Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns , 280 J. Am. Med. Ass'n 2083, 2083 (1998) (emphasis added).[11]
Kanter's only response to the government's statistical studies is that they are not tailored enough to his "individual circumstances." Specifically, Kanter asks the Court "to consider the fact that [he] is a first-time, non-violent offender with no history of violence, firearm misuses, or subsequent convictions." Kanter also points out that he is "employed, married, and does not use illicit drugs, all of which correspond with lower rates of recidivism." In short, Kanter argues that to meet its burden the government must show "a substantial relationship between denying Mr. Kanter a firearm and furthering the government's objective of preventing firearm misuse and armed violence."
Kanter is mistaken. In Skoien we held that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court. Heller did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence." 614 F.3d at 641. Of course, not all nonviolent felons will later commit a violent crime with a firearm. In that sense, the statute is "somewhat over-inclusive." United States v. Chapman , 666 F.3d 220, 231 (4th Cir. 2012). However, that "does not undermine [the statute's] constitutionality ... because it merely suggests that the fit is not a perfect one; a reasonable fit is all that is required under intermediate scrutiny." Id. ; see also Marzzarella , 614 F.3d at 97-98 (analogizing to intermediate scrutiny in First Amendment context).
*450 Here, unlike the challengers in Binderup , who were convicted of "non-serious" state misdemeanors and served no prison time, Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, and he did not face a minor sentence. 836 F.3d at 353 & n.6. Instead, Kanter is more akin to the challenger in Hamilton , whose fraud and theft convictions were "black-letter mala in se felonies reflecting grave misjudgment and maladjustment." 848 F.3d at 627. Kanter's crime-defrauding the federal government out of hundreds of thousands of dollars-"reflect[s] significant disrespect for the law." Id. at 627 n.14 ; see also Medina , 913 F.3d at 160 (rejecting as-applied challenge where plaintiff was convicted of "felony fraud-a serious crime, malum in se, that is punishable in every state"). Thus, Kanter's serious felony conviction prevents him from challenging the constitutionality of § 922(g)(1) as applied to him.[12]
We are further assured in our decision because the highly-individualized approach Kanter proposes raises serious institutional and administrative concerns. See Torres-Rosario , 658 F.3d at 113 ("[S]uch an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning."); see also Medina , 913 F.3d at 159-60 (rejecting argument that "non-dangerous felons have a right to bear arms" because "[u]sing an amorphous 'dangerousness' standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons"). As mentioned above, Congress previously allowed the ATF to restore a felon's gun rights under § 925(c) if the agency determined that "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). However, Congress abandoned that approach after finding that the dangerousness inquiry was a "very difficult" and time-intensive task, H.R. Rep. No. 102-618, at 14 (1992), and that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." H.R. Rep. No. 104-183, at 15 (1995). Congress's failed attempt to delegate this investigative task to a law enforcement agency "should have a profound impact on our tailoring analysis." Binderup , 836 F.3d at 403 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgment).
At bottom, the fact-specific inquiry Kanter asks this Court to undertake is "a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." Bean , 537 U.S. at 77, 123 S.Ct. 584 ; see also Pontarelli v. U.S. Dep't of the Treasury , 285 F.3d 216, 231 (3d Cir. 2002) ("Unlike ATF, courts possess neither the re-sources to conduct the requisite investigations nor the expertise to predict accurately which felons may *451 carry guns without threatening the public's safety."). Moreover, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Schrader , 704 F.3d at 990 (citation and internal quotation marks omitted).
In sum, the government has established that the felon dispossession statutes are substantially related to the important governmental objective of keeping firearms away those convicted of serious crimes. Because Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, his challenge to the constitutionality of § 922(g)(1) is without merit.
III. Conclusion
For the foregoing reasons, we AFFIRM the judgment of the district court.

Accordingly, calling the statute a "felon" dispossession statute is somewhat of a "misnomer." Carly Lagrotteria, Note, Heller's Collateral Damage: As-Applied Challenges to the Felon-in-Possession Prohibition , 86 Fordham L. Rev. 1963, 1970 (2018).

The Attorney General delegated its authority under § 925(c) to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a)(1).

Because "the federal and state prohibitions are equivalent in effect" as to Kanter, our Second Amendment analysis of the two statutes is the same. Baer v. Lynch , 636 F. App'x 695, 698-99 (7th Cir. 2016).

Both parties appealed to the Supreme Court, but the Supreme Court denied the petitions for writ of certiorari. See Sessions v. Binderup , --- U.S. ----, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017) (noting Justices Ginsburg and Sotomayor would grant the petition); Binderup v. Sessions , --- U.S. ----, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017) (same).

But see Berron v. Ill. Concealed Carry Licensing Review Bd., 825 F.3d 843, 847 (7th Cir. 2016) ("When holding in [Heller ] that the Second Amendment establishes personal rights, the Court observed that only law-abiding persons enjoy these rights, even at home.").

Indeed, numerous legal historians have endorsed this view. See, e.g., Saul Cornell, "Don't Know Much About History" The Current Crisis in Second Amendment Scholarship , 29 N. Ky. L. Rev. 657, 679 (2002) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right [that] ... was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign? , 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century ... excluded ... felons [from possessing firearms]."); Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment , 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms."); Glenn Harlan Reynolds, A Critical Guide to the Second Amendment , 62 Tenn. L. Rev. 461, 480 (1995) ("One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) ...." (citation omitted)). Moreover, according to Thomas M. Cooley's 1868 Treatise on Constitutional Limitations, which the Heller court described as a "massively popular" treatise written by "[t]he most famous" late-nineteenth-century legal scholar, 554 U.S. at 616, 128 S.Ct. 2783, certain classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

Although Everist was issued before the Heller decision, the Fifth Circuit already recognized an individual right to bear arms pre-Heller and reaffirmed the validity of the Everist decision after Heller . See Scroggins , 599 F.3d at 451.

For support for Judge Sykes's observation regarding the conflicting scholarship on the historical conception of the Second Amendment, see, e.g., Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009) ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); C. Kevin Marshall, Why Can't Martha Stewart Have a Gun? , 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); Adam Winkler, Heller's Catch-22 , 56 UCLA L. Rev. 1551, 1563 (2009) ("The Founding generation had no laws ... denying the right to people convicted of crimes.").

In fact, we usually defer the threshold historical scope inquiry and proceed directly to means-end scrutiny. See, e.g., Horsley v. Trame , 808 F.3d 1126, 1131 (7th Cir. 2015) (declining to decide whether eighteen- to twenty-year-olds are within the scope of the Second Amendment); Yancey , 621 F.3d at 684-85. One notable exception to our generally restrained approach in this area is United States v. Meza-Rodriguez , 798 F.3d 664 (7th Cir. 2015). There, the majority held that undocumented immigrants were historically within the scope of the Second Amendment but ultimately concluded that the statute at issue nevertheless survived intermediate scrutiny. Id. at 669-73. The concurrence advocated for a "prudential approach" since we did not need to decide the threshold question to resolve the case, and proposed "reserv[ing] resolution of this challenging constitutional question for a case that compels addressing it." Id. at 673-74 (Flaum, J., concurring in the judgment). We think that prudential approach is appropriate here.

Our means-end review is arguably less rigorous in this case because the weight of the historical evidence summarized above suggests that felon dispossession laws do not restrict the "core right of armed defense," but rather burden "activity lying closer to the margins of the right." Ezell II , 846 F.3d at 892. Indeed, we have said that "the state can prevail with less evidence when, as in Skoien, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun." Moore , 702 F.3d at 940. We have even gone so far as to say that "empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill." Id.

Even the study that Kanter relies upon found that approximately 40 percent of individuals convicted of mail fraud had at least one additional arrest afterward. David Weisburd & Elin Waring, White-Collar Crime and Criminal Careers 12, 29 (2004). The same study found that 24.5 percent of all repeat white-collar offenders had at least one violent arrest on their record. Id. at 45. In other words, "white-collar offenders often have multiple contacts with the criminal justice system" and "are unlikely to evidence a high degree of specialization." Id. at 49.

We decline to revisit our comment in Williams "that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." 616 F.3d at 693. That statement was dictum, and we need not determine whether § 922(g)(1) may ever be subject to an as-applied challenge to reach our decision in this case. There may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case. See Broadrick v. Oklahoma , 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").