Filed 12/11/24  P. v. Canela CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D082461 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD287336) |
| GERARDO CANELA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric Swenson and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Gerardo Canela appeals a judgment of conviction after a jury found him guilty of being a felon in possession of a firearm and ammunition.  Relying on *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*), Canela argues California's felon dispossession laws are facially unconstitutional under the Second Amendment to the United States Constitution.

We conclude California's felon dispossession laws are facially valid. Therefore, we affirm the judgment.

# II

## BACKGROUND

### A. *Factual Background*

One evening, Canela and two men walked up to an axe-throwing business in downtown San Diego.  One of Canela's companions had a cut and asked the business owner for a band-aid.  The owner retrieved a first aid kit from the restroom, returned to the storefront, and observed Canela and the second man graffitiing a sign in front of the store.  The owner walked outside and confronted the men, which caused Canela to raise his fists and assume a fighting stance.

The business owner went back inside the store and told the man who needed the band-aid to leave.  After the man exited the store, Canela and his two comrades surrounded the front door, cursed at the owner, and said they were going to fight him.  Canela then pulled a handgun out of his pocket, pointed it at the owner's head, and said, "Do you want this?"  The owner retreated inside and Canela walked away from the store with his companions.

Shortly after, police officers detained Canela and the two other men on a nearby street. Canela had a .25–caliber semiautomatic handgun in his pocket. The handgun was loaded with one round of ammunition in the chamber and another six rounds of ammunition in the magazine.

B. *Procedural Background*

After a trial, a jury found Canela guilty of assault with a firearm (Pen. Code, § 245, subd. (b); count 1);[1] possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2); possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3); carrying an unregistered and concealed firearm (§ 25400, subds. (a)(2), (c)(6); count 4); vandalism (§ 594, subds. (a), (b)(2)(A); count 5); and failure to appear while on bail (§ 1320.5; counts 6–9). The jury also returned true findings on allegations Canela personally used a firearm in the commission of the assault (§§ 1192.7, subd. (c)(8), 12022.5, subd. (a)), and was released on bail when he failed to appear (§ 12022.1, subd. (b)). In a bifurcated proceeding, Canela admitted he had a prior serious felony conviction (§ 667, subd. (a)(1)) and a prior strike within the meaning of the Three Strikes law (§ 667, subds. (b)–(i), 1170.12), both of which arose from a prior conviction for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).

The trial court sentenced Canela to an aggregate term of 20 years and eight months in state prison.

III

DISCUSSION

A. *Felon Dispossession Laws*

Canela mounts a facial constitutional challenge to two state laws that prohibit felons from possessing firearms and ammunition, claiming the laws

---

[1] Further undesignated statutory references are to the Penal Code.

impinge upon the right of persons to keep and bear arms guaranteed by the Second Amendment to the United States Constitution.

California's law barring felons from possessing firearms is codified in section 29800. It states, in relevant part, "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country, or of an offense enumerated in subdivision (a), (b), or (d) of Section 23515, … and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." (§ 29800, subd. (a)(1).)

California's prohibition against possession of ammunition by a felon is codified in section 30305. It provides, in pertinent part, "No person prohibited from owning or possessing a firearm under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title … shall own, possess, or have under custody or control, any ammunition or reloaded ammunition." (§ 30305, subd. (a)(1).)

"The standard for a facial constitutional challenge to a statute is exacting." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.) Under the usual articulation of the standard, a law will be upheld as facially valid unless the challenging party proves the law " 'pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' " (*California School Boards Assn. v. State of California* (2019) 8 Cal.5th 713, 723–724.) Sometimes, courts " 'appl[y] a more lenient standard, asking whether the statute is unconstitutional "in the generality or great majority of cases." ' " (*Ibid.*) "Either way, we consider only the text and purpose of the statute, and 'petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute.' " (*Ibid.*)

4

"Determining the constitutionality of a statute presents a question of law, which we review de novo." (*Persky v. Bushey* (2018) 21 Cal.App.5th 810, 817.)

B. *Second Amendment*

The Second Amendment provides as follows, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.)

Beginning with *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court has in recent years issued several landmark opinions clarifying the purpose and scope of the Second Amendment. In *Heller*, the Supreme Court invalidated a set of District of Columbia (District) laws banning the possession of handguns in the home and requiring that any lawful firearm in the home be disassembled or bound by a trigger lock. (*Id.* at pp. 628–636.) In doing so, the *Heller* court held that the Second Amendment confers an "individual right to possess and carry weapons" unconnected with one's service in a militia. (*Id.* at p. 592.) Stated differently, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id.* at p. 635; see also *id.* at p. 592 [the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation"].)

According to the *Heller* court, "the inherent right of self-defense has been central to the Second Amendment right," yet the District's wholesale handgun ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." (*Heller, supra,* 554 U.S. at pp. 628–629.) Therefore, the court concluded, the District's handgun ban "fail[ed] constitutional muster" under "any of the standards of scrutiny" that courts traditionally have applied to enumerated

constitutional rights. (*Id.* at p. 629.) The *Heller* court also invalidated the District's requirement that lawful firearms in the home be rendered and kept inoperable because it "ma[de] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense." (*Id.* at p. 630.)

Notwithstanding its recognition that the Second Amendment guarantees an individual right to possess and carry arms, the *Heller* court warned that "the right secured by the Second Amendment is not unlimited." (*Heller, supra*, 554 U.S. at p. 626.) Relevant here, it cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Id.* at pp. 626–627; see also *id.* at p. 644 (dis. opn. of Stevens, J.) ["when it finally drills down on the substantive meaning of the Second Amendment, the [majority opinion] limits the protected class to 'law-abiding, responsible citizens' "].) According to *Heller*, these restrictions remained "presumptively lawful regulatory measures." (*Heller* at p. 627, fn. 26.)

Two years after *Heller*, in *McDonald v. City of Chicago* (2010) 561 U.S. 742, the Supreme Court concluded the Second Amendment applies to the States by incorporation through the Due Process Clause of the Fourteenth Amendment. In reaching this conclusion, the court reasoned that the Second Amendment right is subject to incorporation because it is fundamental to our scheme of ordered liberty and deeply rooted in the Nation's history and tradition. (*Id.* at pp. 767–780.) In particular, the court emphasized that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, [the court] held that individual self-defense is 'the *central component*' of the Second Amendment right." (*Id.* at

6

p. 767.)  Yet, even as the court expanded the reach of the Second Amendment through its incorporation ruling, it again "repeat[ed] [its] assurances" from *Heller* that "longstanding regulatory measures," like those prohibiting felons from possessing firearms, were not imperiled.  (*Id.* at p. 786; see also *id.* at p. 925 (dis. opn. of Breyer, J.) [*Heller* and *McDonald* do "not touch 'prohibitions on the possession of firearms by felons' "].)

In *Bruen, supra*, 597 U.S. 1, the Supreme Court articulated the proper framework governing Second Amendment challenges to firearm regulations. *Bruen* concerned a New York licensing scheme that criminalized possession of a firearm without a license and required an applicant to show proper cause—i.e., a special need for self-protection distinguishable from that of the general community—to obtain an unrestricted license to have and carry a concealed pistol or revolver outside the home.  (*Id.* at pp. 11–12.)  *Bruen* held the plain text of the Second Amendment safeguards the right of law-abiding, adult citizens to bear arms in public for self-defense and thus presumptively protected the conduct that was regulated by the licensing scheme.  (*Id.* at pp. 31–33.)  According to the court, regulation of such presumptively protected conduct survives constitutional scrutiny only if the government proves its regulation is "consistent with this Nation's historical tradition of firearm regulation."  (*Id.* at p. 17; see *id.* at p. 19 ["the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"].)

"In some cases, that inquiry will be fairly straightforward.  For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  (*Bruen,*

*supra*, 597 U.S. at p. 26.) However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." (*Id.* at p. 27.) In particular, when a legal challenge is brought to a modern regulation that was "unimaginable at the founding," the "historical inquiry that courts must conduct will often involve reasoning by analogy." (*Id.* at p. 28.) The inquiry into "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " (*Ibid.*) "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' [Citation.] On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id.* at p. 30.)

After conducting an extensive analysis of historical sources dating from the thirteenth century to the twentieth century, the *Bruen* court concluded that "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." (*Bruen, supra*, 597 U.S. at p. 70; see *id.* at p. 38 ["the historical record … does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense"].) Thus, the court concluded New York's licensing scheme violated the Second Amendment. (*Id.* at p. 71.) Yet, once again, the court emphasized the limits of its decision, noting that it did not necessarily invalidate 43 other state licensing schemes that did *not* require applicants to demonstrate a heightened need to obtain a license. (*Id.* at p. 38, fn. 9.) As the court explained, these schemes, "which often require applicants to

8

undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " (*Ibid*.; see also *id*. at p. 72 (conc. opn. of Alito, J.) ["Our holding decides nothing about who may lawfully possess a firearm"]; *id*. at pp. 80–81 (conc. opn. of Kavanaugh, J.) [reiterating that bans on the possession of firearms by felons are presumptively valid regulations].)

Most recently, in *United States v. Rahimi* (2024) 602 U.S. __ [144 S.Ct. 1889] (*Rahimi*), the Supreme Court applied the *Bruen* standard to uphold a federal law that prohibited a person subject to a domestic violence restraining order from possessing a firearm if the order included a finding the person represented a credible threat to the physical safety of an intimate partner or child. Discussing the *Bruen* standard, the *Rahimi* court explained that *Bruen* was never "meant to suggest a law trapped in amber," or to signal the only constitutional firearm regulations are those "identical to ones that could be found in 1791." (*Id.* at p. __ [144 S.Ct. at pp. 1897–1898].) Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." (*Id.* at p. __ [144 S.Ct. at p. 1898].) Analyzing the federal statute through this lens, the *Rahimi* court concluded the law was constitutional because, by the 1700s and early 1800s, our country had surety laws that targeted the misuse of firearms, as well as "going armed" laws that prohibited persons from riding or going armed to terrify others with dangerous or unusual weapons. (*Id.* at p. __ [144 S.Ct. at pp. 1899–1901].) Although the federal statute at issue was not "identical to these founding era regimes," the court held it was nonetheless constitutional because "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fit[] neatly

9

within the tradition the surety and going armed laws represent." (*Id.* at p. __ [144 S.Ct. at p. 1901].)

C. *California's Felon Dispossession Laws are Facially Valid*

Against this legal backdrop, Canela asserts California's prohibitions against felons possessing firearms and ammunition facially violate the Second Amendment. The government presents two arguments in defense of the state's laws. First, it claims the Second Amendment does not cover the conduct regulated by the state's felon dispossession laws because felons do not fall within the definition of "the People" who, under the Second Amendment, have a constitutional right to keep and bear arms. Second, the government argues the laws are constitutional because they are consistent with our Nation's historical tradition of firearm regulation.

In the wake of *Bruen*, the Courts of Appeal within our state have been divided on the first question of whether felons fall within the definition of "the People" who enjoy a constitutional right to keep and bear arms under the Second Amendment. (Compare *People v. Alexander* (2023) 91 Cal.App.5th 469 [felons are not within the class of people afforded rights under the Second Amendment]; *People v. Odell* (2023) 92 Cal.App.5th 307 [same]; and *People v. Ceja* (2023) 94 Cal.App.5th 1296 [same]; with *People v. Anderson* (2024) 104 Cal.App.5th 577, 588 (*Anderson*) ["We see no basis for categorically excluding persons with prior felony convictions from the protections of the Bill of

Rights."].)[2] We need not enter the fray because, assuming for purposes of this appeal that felons are included within the class of persons with Second Amendment rights, we conclude the People have carried their burden of showing that California's felon dispossession laws are valid because they are consistent with our Nation's historical tradition of firearm regulation.

Our colleagues from the First District Court of Appeal catalogued this historical tradition in *Anderson, supra*, 104 Cal.App.5th 577, in an extensive analysis we briefly summarize and adopt as though it were set forth fully herein. As the *Anderson* court explained, the tradition dates back at least to 17th century England and the English Bill of Rights, a charter widely acknowledged to be the predecessor to the Second Amendment. (*Anderson,* at

_____

[2] Since *Bruen*, the intermediate federal courts have largely determined that felons fall within the class of persons who make up "the People," and thus have a right to keep and bear arms, under the Second Amendment. (*Range v. AG United States* (3d Cir. 2023) 69 F.4th 96, 103 ["we reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people" protected by the Second Amendment' "], judg. vacated and remanded by *Garland v. Range* (2024) __U.S. __, 144 S.Ct. 2706; *United States v. Diaz* (5th Cir. 2024) 116 F.4th 458, 466 (*Diaz*) ["The government also raises the familiar argument that [a felon] is not among 'the people' protected by the Second Amendment. We disagree."]; *United States v. Williams* (6th Cir. 2024) 113 F.4th 637, 649 (*Williams*) ["Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons"]; *United States v. Perez-Garcia* (9th Cir. 2024) 96 F.4th 1166, 1180 [the U.S. Supreme Court "has never suggested that felons are not among 'the people' within the plain meaning of the Second Amendment"]; *Rocky Mountain Gun Owners v. Polis* (10th Cir. 2024) 121 F.4th 96, 116 [Americans with felony convictions "are both 'person[s]' and 'citizens,' and thus, must also be included in 'the people.' "]; see also *Antonyuk v. James* (2d Cir. 2024) 120 F.4th 941, 981 [it is "at best, a controversial supposition," to claim that irresponsible citizens who do not follow the law are excluded from the Second Amendment entirely]; *Kanter v. Barr* (7th Cir. 2019) 919 F.3d 437, 453 (dis. opn. of Barrett, J.) ["Neither felons nor the mentally ill are categorically excluded from our national community."].)

pp. 589–591.) The English Bill of Rights "declares ' "that the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." ' " (*Id.* at p. 590.) The *Anderson* court observed several key "limitations" in the English Bill of Rights' formulation of the right to have arms. (*Id.* at p. 590.) "First, in 1689 the right to have arms belonged only to ' "Protestants." ' " (*Id.* at p. 590.) "The second notable aspect of this English right is that it extended only as ' "suitable to [a subject's] condition[ ]," ' " a limitation that resulted in the disarmament of people who lacked wealth or those who were perceived to be dangerous to the peace of the nation. (*Id.* at pp. 590–591.) And third, the right to have arms was "subject to the regulation of Parliament." (*Id.* at p. 591.) Thus, the right to have arms enshrined in the English Bill of Rights was " 'not available to the whole population' and 'held only against the Crown, not Parliament.' " (*Ibid.*)

According to the *Anderson* court, "[t]he English tradition of disarming those whom Parliament did not trust to be law-abiding or loyal members of society carried over to the American colonies and persisted as the colonies became new states." (*Anderson, supra*, 104 Cal.App.5th at p. 591.) Notably, disarmament "was an accepted sanction for an individual's criminal behavior in colonial America." (*Id.* at p. 592.) For example, colonies had well-known "going armed" laws, "prohibitions on going armed in a manner that disrupted public order," which "were enforced 'with "forfeiture of the arms ... and imprisonment." ' " (*Ibid.*) Some colonies disarmed persons perceived to be disloyal, including persons who refused to defend the colonies or those who libeled or defamed the acts of the Continental Congress. (*Id.* at p. 593.) Colonies also enacted laws prohibiting arms for particular racial groups, including laws that prevented African Americans from possessing guns and laws that made it a crime for anyone to sell (or give) a firearm or ammunition

12

to Native Americans. (*Id.* at pp. 591–592.) And they enacted laws disarming entire groups of people, such as Catholics and nonconformist Protestants, due to their religious affiliations. (*Id.* at p. 592.) Although "disarmament based on racial categories or religious affiliation is odious to the Constitution," as it is understood today, "the point remains that these historical practices show the generation that adopted the Second Amendment understood the right it was enshrining in the Constitution to be limited." (*Id.* at pp. 597–598.)

Turning to the federal period, the *Anderson* court analyzed early state constitutional guarantees of the right to keep and bear arms, which preceded the passage of Second Amendment, and concluded that "the founding generation did not consider the constitutional right to arms inherited from the English legal tradition to be inconsistent with legislative enactments disarming individuals convicted of serious crimes or otherwise dangerous to the community." (*Anderson, supra*, 104 Cal.App.5th at p. 594.) In particular, the *Anderson* court emphasized that in Pennsylvania and North Carolina—two states with such early guarantees—the states "passed statutes disarming citizens for refusing to take a loyalty oath the year after they added the right to bear arms to their state constitutions. And in Massachusetts, the legislature imposed disarmament as a sanction for participants in Shays' rebellion just a few years after the state adopted its Second Amendment equivalent." (*Id.* at p. 594.) Further, the *Anderson* court recited "historical accounts of deliberations over whether to ratify the federal Constitution," and from these historical accounts concluded there was "a common understanding amongst the founding generation that legislatures could disarm persons unwilling or unable to follow the law." (*Id.* at pp. 594–595.)

"[T]his historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect

13

sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence." (*Anderson, supra*, 104 Cal.App.5th at p. 598.)  The *Anderson* court concluded that "California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes." (*Ibid.*)  We agree.

Further, "section 29800 imposes a similar burden on the right to arms as do these historical analogues." (*Anderson, supra*, 104 Cal.App.5th at p. 598.)  "As with the categorical disarmament laws, section 29800's deprivation of rights is complete for those assessed unwilling to respect sovereign authority, but the statute does not 'restrict arms use by the public generally.' " (*Ibid.*)  "As with the criminal penalty of disarmament, section 29800 deprives an individual of weapons only after he or she has been convicted in a court of law, with all the attendant protections of due process." (*Ibid.*)  Therefore, our "nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony." (*Id.* at p. 599.)  "Because section 29800 passes constitutional muster on this basis, so too does section 30305; it merely extends section 29800's prohibition on felons possessing firearms to prevent felons also from possessing ammunition." (*Id.* at pp. 599–600.)

In sum, our state's felon dispossession laws "are constitutional, as they are 'consistent with the principles that underpin' this nation's 'regulatory

tradition.' " (*Anderson, supra*, 104 Cal.App.5th at p. 582.)  Because the felon dispossession laws are facially valid, the judgment must be affirmed.[3]

IV

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.

---

[3]    Our conclusion is consistent with several post-*Bruen* decisions from the intermediate federal courts upholding felon dispossession laws against Second Amendment challenges.  (See *United States v. Moore* (3d Cir. 2024) 111 F.4th 266, 273 ["history and tradition support disarming convicts"]; *United States v. Canada* (4th Cir. 2024) 103 F.4th 257, 259 ["the government may constitutionally forbid people who have been found guilty of [felonious] acts from continuing to possess firearms."], judg. vacated and remanded by *Canada v. United States* (2024) __ S.Ct. __ [2024 WL 4654952]; *Diaz, supra*, 116 F.4th at p. 472 ["The government has met its burden to show that applying [the federal felon dispossession law] to [the defendant] is consistent with this Nation's historical tradition of firearm regulation"]; *Williams, supra*, 113 F.4th at p. 657 ["our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous"]; *United States v. Jackson* (8th Cir. 2024) 110 F.4th 1120, 1129 ["Congress acted within the historical tradition when it enacted … the prohibition on possession of firearms by felons."].)

15