RENDERED:  OCTOBER 3, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0366-MR

COMMONWEALTH OF KENTUCKY      APPELLANT

v.
APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MELISSA L. BELLOWS, JUDGE
ACTION NO. 22-CR-000450

JECORY LAMONT FRAZIER      APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, EASTON, AND L. JONES, JUDGES.

CALDWELL, JUDGE:  Following his indictment for felon-in-possession of a
firearm and tampering with evidence, Jecory Lamont Frazier ("Frazier") moved the
trial court to dismiss the felon-in-possession charge on grounds the statute was a
violation of the Second Amendment.  The trial court agreed and issued an order
declaring KRS[1] 527.040 facially unconstitutional and dismissing the entire

---

[1] Kentucky Revised Statutes.

indictment.  Because the trial court erred as a matter of law, we reverse and remand with instructions the charges against Frazier be reinstated.

## BACKGROUND

After being indicted for being a felon-in-possession of a firearm and for tampering with physical evidence, Frazier was arraigned before the Jefferson Circuit Court on March 21, 2022.  In October 2023, Frazier submitted a motion to the trial court requesting dismissal of the felon-in-possession charge as unconstitutional.[2]  Frazier's motion argued that Kentucky's felon-in-possession statute could not withstand the scrutiny of a constitutional challenge following developments in caselaw issuing from the United States Supreme Court regarding the Second Amendment of the United States Constitution.

Specifically, Frazier alleged that the required analysis for evaluation of a constitutional challenge under the Second Amendment had been upended by the United States Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).  Frazier argued that, under the test announced in *Bruen*, the Commonwealth was required to establish that Kentucky's felon-in-possession statute was consistent with the Nation's historical tradition of firearm regulation.  The Commonwealth would be

---

[2] A certificate of service attached to Frazier's motion indicates it was served by certified mail upon the Attorney General.  *See* KRS 418.075.

unable to do so, Frazier argued, because no regulations at the time of the Nation's founding permanently disarmed persons based on having a prior felony conviction.

Frazier acknowledged longstanding precedent wherein the Kentucky Supreme Court had affirmed the constitutionality of KRS 527.040 under the right to bear arms in the Kentucky Constitution and cited to that Court's most recent published case addressing the subject, *Posey v. Commonwealth*, 185 S.W.3d 170 (Ky. 2006). However, Frazier argued, *Posey* had concluded the statute was constitutional by utilization of a means-end scrutiny which was impermissible after *Bruen*. Frazier pointed to the dissenting opinion in *Posey*, which argued that KRS 527.040 was unconstitutional under the Kentucky State Constitution, as prescient and a prototype for the analysis required by *Bruen*. Frazier's motion made no specific argument that application to his particular circumstances demonstrated the statute's unconstitutionality. His allegation was, plainly, that *Bruen* had rendered the felon-in-possession statute impermissible because no historical parallel could be drawn.

The Commonwealth submitted a response memorandum opposing Frazier's motion, arguing Frazier had drastically overstated the effect of the *Bruen* decision. The Commonwealth argued *Bruen* was fully in line with prior Second Amendment decisions which had specifically admonished that felon-in-possession statutes carried a presumption of constitutional validity.

As a result, the Commonwealth argued, *Bruen* did not require it to demonstrate that KRS 527.040 fit within the Nation's historical tradition of firearms regulation. But, even if *Bruen* **did** require it to meet this burden, the Commonwealth argued, Kentucky's felon-in-possession statute **was** fully consistent with any standard announced in *Bruen*.

Like Frazier, the Commonwealth argued a prototypical historical analysis which fit the test required under *Bruen* could be found within the larger *Posey* decision. However, Frazier pointed to the concurring opinion in *Posey*, which had asserted the historical analysis relied upon in the majority opinion as the *sole* basis that establishes KRS 527.040's constitutionality under the right to bear arms in the State Constitution. The Commonwealth, however, argued the historical analysis elaborated upon in the *Posey* concurrence demonstrated that Kentucky's felon-in-possession statute fit neatly within the Nation's historical tradition of firearm regulation under the Second Amendment analysis announced in *Bruen*.

Additionally, the Commonwealth cited to precedent from an outside jurisdiction which had considered a challenge to the federal felon-in-possession statute shortly after the decision in *Bruen* was rendered. That opinion relied upon historical analysis similar to that cited in *Posey*, including overlapping sources. And the opinion further discussed historical punishments for felonies it determined

-4-

were sufficiently analogous under *Bruen* to establish the constitutionality of the federal felon-in-possession statute.

The Commonwealth pointed out that, similar to *Posey*, the opinion cited to academic discussions of what we will today reference as the "virtuous person" theory. This theory posits that, historically, the original conception of an individual right to bear arms was tied with the individual maintaining a certain amount of virtue. Felon-in-possession laws, the Commonwealth argued, were fully consistent with the Nation's tradition as convicted felons were, historically, no longer among the persons to whom the right to bear arms was extended.

Additionally, the Commonwealth argued, a number of laws around the time of the Founding provided sufficient historical analogues under *Bruen* to establish that the Kentucky legislature had been consistent with the Nation's tradition of firearms regulation when banning convicted felons from possessing firearms. At the time of the Founding, convicted felons faced harsh punishments, including the death penalty as well as being stripped of all property. The lesser punishment of being disarmed, the Commonwealth argued, was surely consistent with this tradition.

The trial court issued an opinion and order which dismissed both counts of the indictment against Frazier ("Order") on March 14, 2024. The trial court held the Commonwealth had failed to meet its burden to demonstrate the

constitutionality of KRS 527.040. The Order rejected the Commonwealth's argument that felon-in-possession laws remained presumptively constitutional in the wake of *Bruen*. The Order further found the Commonwealth had failed to show any national history or tradition of disarming felons at the time of the Founding. In rejecting Kentucky precedent declaring KRS 527.040 facially constitutional, the Order spent considerable space on a discussion of the "virtuous person" theory.

The Commonwealth filed a timely appeal. Additional facts will be developed herein as necessary.

## STANDARD OF REVIEW

Where we review a trial court's determination regarding the constitutionality of a statute, we apply a *de novo* standard of review. *S.W. v. S.W.M.*, 647 S.W.3d 866, 873 (Ky. App. 2022) (citing *Teco/Perry County Coal v. Feltner*, 582 S.W.3d 42, 45 (Ky. 2019)).

"In considering an attack on the constitutionality of legislation, this Court has continually resolved any doubt in favor of constitutionality rather than unconstitutionality." *Id.* (quoting *Hallahan v. Mittlebeeler*, 373 S.W.2d 726, 727 (Ky. 1963)). A constitutional infringement must be "clear, complete and unmistakable" to render the statute unconstitutional. *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009)

-6-

(quoting *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Company*, 983 S.W.2d 493, 499 (Ky. 1998)). "[T]he doubt resolved in favor of the voice of the people as expressed through their legislative department of government." *Posey*, 185 S.W.3d at 175 (quoting *Walters v. Bindner*, 435 S.W.2d 464, 467 (Ky. 1968)). Stated another way, "we are 'obligated to give it, if possible, an interpretation which upholds its constitutional validity.'" *Commonwealth v. Halsell*, 934 S.W.2d 552, 554 (Ky. 1996) (quoting *American Trucking Ass'n v. Com., Transp. Cab.*, 676 S.W.2d 785, 789 (Ky. 1984)) (emphasis added).

## ANALYSIS

**Frazier Made a Facial Challenge to the Constitutionality of KRS 527.040**

We must initially determine the specific issues, and scope thereof, which are correctly before us. The parties dispute the nature of the constitutional challenge presented to the trial court as well as the nature of the Order. The Commonwealth argues the Order plainly found the statute facially unconstitutional in all applications and without any indication it had considered Frazier's unique circumstances. Furthermore, the Commonwealth maintains, Frazier clearly *presented* only a facial challenge and did not create an adequate record for the trial court to evaluate any as-applied constitutional challenge before submitting the motion. Frazier disputes this, as we discuss below.

This distinction is critical because of profoundly different principles which are invoked for a court's evaluation of a constitutional challenge, depending on the nature of the challenge:

> Constitutional challenges to statutes generally fall within one of two categories: a facial challenge or an as-applied challenge. In order to declare a statute unconstitutional on its face, a court must find that the law is unconstitutional in all its applications. It is a well-established principle that [a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. On the other hand, in order to declare a statute unconstitutional as applied, a court must find the law unconstitutional as applied to the challenger's particular circumstances.

*Commonwealth v. Bredhold*, 599 S.W.3d 409, 415-16 (Ky. 2020) (internal quotation marks and citations omitted).

The Commonwealth points out that, in Frazier's written motion submitted to the trial court, he offered no specific argument that KRS 527.040 was unconstitutional *as applied* to his particular circumstances. Frazier did not attach an official copy of his criminal history and no reference to his specific criminal record was made. In fact, following the opening page of his supporting memorandum, Frazier was referred to with an incorrect name. For instance, Frazier's supporting memorandum closes:

> the statute under which Mr. Turner [*sic*] is charged fails to be consistent with the Nation's historical tradition of

firearm regulation as required by *Bruen*. Mr. Turner [*sic*] respectfully requests that this Court enter the attached Order dismissing the Felon in Possession charge in this matter as unconstitutional.

Frazier concedes that he did not explicitly submit an as-applied constitutional challenge and no official copy of his criminal history was before the trial court. Frazier's Appellee brief argues neither was necessary as he "actually made a newly-minted *Bruen* challenge to the statute[.]" Frazier counts the general dichotomy of facial/as-applied constitutional challenges among the aspects of Second Amendment analysis he maintains have been upended by *Bruen*.

During oral argument, the trial judge inquired as to what role Frazier's criminal history played into his rights under the Second Amendment. Frazier argued that he believed the motion to dismiss should be granted regardless of his criminal history but posited that he could supplement the record with his criminal history. Answering the same inquiry from the trial judge, the Commonwealth argued that consideration of Frazier's particular criminal history would not be appropriate in light of the motion he had submitted.

Here, however, Frazier argues we should treat the Order as a determination the statute is unconstitutional *both* facially and as applied to Frazier individually. He cites to nothing specific in *Bruen* for his assertion that the general categories of facial and as-applied challenges are inapplicable in the context of a Second Amendment challenge, only an absence of the word "facial" or "applied."

-9-

Furthermore, Frazier offers no suggestion as to how this Court might go about evaluating the statute as applied to his particular criminal history. Frazier does not contest the Commonwealth's assertion that a certified copy of his criminal history was never submitted, nor does he point to anywhere in the record that we might otherwise review evidence which was before the trial court. Instead, he complains that he offered to submit his criminal record to the trial court but the trial court declined.

In its Reply Brief, the Commonwealth argues that the United States Supreme Court has recognized explicitly the general dichotomy of constitutional challenges in the specific context of a Second Amendment challenge subsequent to *Bruen*. The Commonwealth argues this undercuts Frazier's argument that *Bruen* had somehow upended the categorization of facial and as-applied constitutional challenges. We agree.

After the Order in this case, the United States Supreme Court analyzed a case arising from lower courts' interpretation of the test announced in *Bruen*, in *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024). There, the Court noted that Rahimi had challenged 18 U.S.C.[3] § 922(g)(8), the federal statute which prohibits individuals subject to a domestic

---

[3] United States Code.

violence restraining order from possessing a firearm, "on its face." *Rahimi*, 602 U.S. at 693, 144 S. Ct. at 1898. The Court reiterated that a facial constitutional challenge is the "most difficult challenge to mount successfully[.]" *Id.* (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987)).[4] Frazier acknowledges *Rahimi* elsewhere in his larger argument, as will be discussed below. However, regarding his argument that *Bruen* upended the dual categories of constitutional challenges, Frazier is silent as to why the Supreme Court again recognized the general duality of constitutional challenges to statutes in *Rahimi*.

Furthermore, in Frazier's brief, he conflates *challenge* with *test*, and characterizes the trial court as "conducting a *Bruen* test of the statute (as opposed to a facial or 'as applied' challenge)[.]" Here, there was no official copy of Frazier's criminal history before the trial court. Although general statements regarding Frazier's prior convictions were made by both parties during oral arguments, nothing stated by the trial judge from the bench or in the Order indicates these statements were considered. We likewise decline to consider those statements and disregard them from any consideration toward today's decision.

---

[4] Despite noting that he had only facially challenged the statute, the *Rahimi* Court did consider the question as to whether the statute was constitutional as applied to the specific facts of the case and concluded that it was. However, that case concerned disarming as a result of being subject to a domestic violence order and the hearing giving rise to the domestic violence order was on the record before the Court.

Statements by counsel while gleaning over CourtNet in open court, rather than the official court records or certified copies, are not evidence of Frazier's prior convictions. *Finnell v. Commonwealth*, 295 S.W.3d 829, 835 (Ky. 2009). In sum, even briefly deferring to Frazier's argument that he attempted to present a constitutional challenge of an as-applied nature, Frazier did not sufficiently preserve it.

Without doubt, we agree with the Commonwealth that the written motion submitted by Frazier was a facial challenge only to KRS 527.040.[5] Furthermore, we agree the language of the Order, in effect, deems KRS 527.040 facially unconstitutional. Frazier did not create an adequate record for the trial court, or this Court, to evaluate an as-applied challenge to the statute. Nothing in the trial court's order contains any reasoning which turns on Frazier's unique circumstances. Nowhere in the Order is it specified whether the trial court has found the statute unconstitutional facially or as-applied or both. There is no other reasonable reading than that the trial court has made a facial determination only.

---

[5] Frazier has referred to his challenge as an allegation that KRS 527.040 is overbroad. A facial overbreadth challenge posits that a "statute could not be enforced against [a plaintiff], because it could not be enforced against someone else[.]" *Sabri v. United States*, 541 U.S. 600, 609, 124 S. Ct. 1941, 1949, 158 L. Ed. 2d 891 (2004). However, the Supreme Court has "recognized the validity of facial attacks alleging overbreadth (though not necessarily using that term) in relatively few settings, and, generally, on the strength of specific reasons weighty enough to overcome [its] well-founded reticence." *Id*. at 609-10, 124 S. Ct. at 1948. Frazier offers no specific argument or authority for why this Court should recognize a facial overbreadth challenge in the context of a Second Amendment claim. We accordingly reject this argument.

We are limited in our review, then, to consideration only of whether the trial court

erred in finding KRS 527.040 facially unconstitutional.

> Facial challenges are disfavored for several
> reasons. Claims of facial invalidity often rest on
> speculation. As a consequence, they raise the risk of
> premature interpretation of statutes on the basis of
> factually barebones records. Facial challenges also run
> contrary to the fundamental principle of judicial restraint
> that courts should neither anticipate a question of
> constitutional law in advance of the necessity of deciding
> it nor formulate a rule of constitutional law broader than
> is required by the precise facts to which it is to be
> applied. Finally, facial challenges threaten to short
> circuit the democratic process by preventing laws
> embodying the will of the people from being
> implemented in a manner consistent with the
> Constitution. We must keep in mind that a ruling of
> unconstitutionality frustrates the intent of the elected
> representatives of the people.

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442,

450-51, 128 S. Ct. 1184, 1191, 170 L. Ed. 2d 151 (2008) (internal quotation marks

and citations omitted).

### The Trial Court Faced a Complex Backdrop of State and Federal Law Regarding the Right to Bear Arms

The arguments before us are focused upon the effect of a single

opinion of the United States Supreme Court. However, aside from a myriad of

rapidly emerging federal caselaw interpreting the analysis articulated in *Bruen*, the

backdrop of the trial court's decision also included consideration of Kentucky law

on the right to bear arms. In Frazier's briefs to this Court, we are not asked to

-13-

revisit the application of our State Constitution. The question presented is what the federal constitution requires. Even if we were to accept Frazier's contention about what the Commonwealth must show after *Bruen*, prior Kentucky precedents speak to the historical antecedents to firearms regulation, including possession by felons. It was appropriate for the circuit court to discuss these Kentucky precedents in this context and for us to do likewise.

Kentucky's statutory ban on the possession of firearms by convicted felons is relatively recent. The initial version of KRS 527.040 took effect in 1975. 1974 Kentucky Laws Ch. 406, § 237, eff. 1-1-75. At that time, Kentucky's felon-in-possession statute barred convicted felons from possessing, manufacturing, or transporting a "handgun" rather than the broader category of "firearm." In 1994, the legislature expanded the statute's scope to bar convicted felons from possession of "firearms." 1994 Kentucky Laws Ch. 396, § 10, c 30, § 3, eff. 7-15-94. Otherwise, the statutory language relevant to this case, quoted above, is substantially the same as the initial version.

In pertinent part, KRS 527.040 provides that:

A person is guilty of possession of a firearm by a convicted felon when he possesses, manufactures, or transports a firearm when he has been convicted of a felony, as defined by the laws of the jurisdiction in which he was convicted, in any state or federal court[.]

KRS 527.040. Kentucky's felon-in-possession statute is 527.040, for all purposes relevant to this case, is a close parallel to 18 U.S.C. § 922(g)(1).

The Kentucky Constitution was drafted and enacted near in time to the Nation's founding, in 1792. The original Kentucky Constitution included the right to bear arms. "The rights of the citizens to bear arms in defense of themselves and the State shall not be questioned." KY. CONST. of 1792, Art. XII, § 23. With some language modified by the time of ratification, the right appeared in the opening Bill of Rights to the modern Kentucky Constitution, adopted in 1891, which begins: "[a]ll men are, by nature, free and equal, and have certain inherent and inalienable rights," before providing a list of seven of these rights. KY. CONST. § 1. The seventh of the inherent and inalienable rights, and the limitations of the legislature in respect, is described: "[t]he right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons." KY. CONST. § 1(7).

Explicit recognition of the Kentucky constitutional right to bear arms extending to individuals outside of militia service is long-standing and well predates the United States Supreme Court's explicit recognition of an individual right in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). Nearly seventy years ago, this Court recognized the right in Kentucky's Constitution as: "an exemplification of the broadest expression of the

right to bear arms." *Holland v. Commonwealth*, 294 S.W.2d 83, 85 (Ky. App. 1956). We contrasted the right in Kentucky with other jurisdictions which "give the legislature the right to regulate the carrying of firearms" and "at least one state [which] prohibit[ed] even the possession of firearms." *Id.* (citing *Pierce v. State of Oklahoma*, 42 Okl.Cr. 272, 275 P. 393, 73 A.L.R. 833 (1929)).

> In our state the legislature is empowered only to deny to citizens the right to carry concealed weapons. The constitutional provision is an affirmation of the faith that all men have the inherent right to arm themselves for the defense of themselves and of the state. The only limitation concerns the mode of carrying such instruments.

*Holland*, 294 S.W.2d at 85.

The first facial challenge to KRS 527.040 considered by our Commonwealth's Supreme Court occurred in *Eary v. Commonwealth*, 659 S.W.2d 198 (Ky. 1983). There, the defendant had appealed his conviction for felon-in-possession of a handgun and argued that "KRS 527.040—is unconstitutional, as it conflicts with § 1(7) of the Kentucky Constitution, which section grants to all men '[t]he right to bear arms in defense of themselves . . . .'" *Id.* at 200.

In a single paragraph, the Court tersely dispensed with what it deemed a "specious argument" that was "almost patently meritless and would not warrant comment except that both movant and respondent state that it is a point of first impression in this jurisdiction":

-16-

> We hold that the statute is constitutional as a valid exercise of the police power of the Commonwealth of Kentucky. It is our opinion that a statute limiting the possession of firearms by persons who, by their past commission of serious felonies, have demonstrated a dangerous disregard for the law and thereby present a threat of further criminal activity is reasonable legislation in the interest of public welfare and safety and that such regulation is constitutionally permissible as a reasonable and legitimate exercise of the police power.

*Eary*, 659 S.W.2d at 200.

A facial challenge to KRS 527.040 was considered at greater length by the Kentucky Supreme Court in *Posey*, 185 S.W.3d 170. Writing a short time before *Heller*'s recognition of individual protection outside of militia service under the Second Amendment, the *Posey* Court found that a "right to bear arms *in defense of themselves*" had been "recognized and preserved" in the Commonwealth by the Kentucky Constitution "in 1792." *Id*. at 179 (emphasis added). The majority opinion in *Posey* concluded "that the regulation contained within KRS 527.040 is not arbitrary or irrational and does not unduly infringe upon the right to bear arms which was reserved to the people through Section 1(7) of our constitution." 185 S.W.3d at 181.

However, the majority's most explicit reasoning is set forth in a historical analysis which concludes that convicted felons were not among the people to whom the right to bear arms in the Kentucky Constitution applied. This occurred, in part, during analysis and rejection of the defendant's argument that

-17-

changes in terminology between the Kentucky Constitution in 1791 and the 1890 constitutional convention had demonstrated an intent to expand the scope of the right to bear arms to include felons. *Posey*, 185 S.W.3d at 177. The defendant argued that a change from "citizens" to "men" had indicated the intent to expand the persons within the scope of protection to include convicted felons at the time of ratification. However, the *Posey* Court rejected this argument largely based upon its conclusion that the right to bear arms had been considered a natural right and it was therefore categorically distinguished from the right to vote:

> Moreover, the reason that voting rights exist within a completely different section of the constitution is because voting was not thought to be a natural, inalienable and inherent right of the people (like the right to bear arms) at the time that our modern constitution was drafted. *See* Ky Const. § 1; Volume 1 *Proceedings and Debates of the Constitutional Convention of 1890*, 534 [hereinafter "Debates"] (Delegate Bronston, C.J.) (listing the absolute rights of man); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) (right to vote is "not regarded strictly as a natural right, but as a privilege merely conceded by society"). Rather, voting was a privilege which was conferred to the people through the prudence and consent of the legislature. It is self-evident that a grant of power requires some specificity so as to prevent such power from being swallowed within those powers which have otherwise been limited or reserved. *See Varney v. Justice*, 86 Ky. 596, 6 S.W. 457, 459 (1888). Such specificity is not particularly necessary or desired, however, when it comes to reserving (or perhaps, preserving) the people's natural and inherent rights. *See* Ky Const. §§ 1, 4, 26; 16 Am. Jur. 2d *Constitutional Law* § 40 (discussing constitutions as grants or limitations of power); *Cf. The*

-18-

> *Federalist No. 45*, at 236 (James Madison) ("The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite."). Accordingly, we also cannot infer a clear intent to endow convicted felons with the right to possess firearms by reference to language utilized in a different section of the constitution for a different purpose.

*Id*. at 179.

The *Posey* majority cited to and, at times, relied upon an opinion of the Oregon Supreme Court examining whether Oregon's felon-in-possession statute was consistent with the right to bear arms in Oregon's Constitution. *Oregon v. Hirsch/Friend*, 338 Or. 622, 114 P.3d 1104 (2005), *overruled on other grounds by Oregon v. Christian*, 354 Or. 22, 307 P.3d 429 (2013). Later Oregon precedent described *Hirsch* as conducting an "extensive historical excavation of the Second Amendment and its origins" and affirming the constitutionality of Oregon's felon-in-possession statute. *Oregon v. Parras*, 326 Or. App. 246, 254-55, 531 P.3d 711, 716 (2023), *review denied*, 371 Or. 511, 538 P.3d 577 (2023), *and petition for review abated*, No. S070409, 2023 WL 9596879 (Or. Dec. 21, 2023), *and review denied*, 372 Or. 763, 557 P.3d 164 (2024) (citing *Hirsch*, 338 Or. 622, 114 P.3d 1104).

While the Oregon Constitution was not drafted near the time of the Nation's founding, the *Hirsch* Court recognized that the right to bear arms in the Oregon Constitution was based upon a conception of the right as held near the

-19-

Founding.  *Hirsch*, 338 Or. 622, 114 P.3d at 1116, 1118; *see also* The Honorable Bruce D. Black & Kara L. Kapp, *State Constitutional Law As A Basis for Federal Constitutional Interpretation:  The Lessons of the Second Amendment*, 46 N.M. L. REV. 240, 280 (2016) ("[N]otably some state provisions that came after the enactment of the Fourteenth Amendment were patterned on early provisions: Oregon's right to bear arms was patterned on the Indiana constitution's enumeration, which was patterned on the Ohio and Kentucky provisions, which were patterned on the Pennsylvania provision.").

The majority opinion in *Posey* relied upon *Hirsch* to further consider the defendant's argument regarding an expansion of rights conferred by the modification to "men" from "citizens" in the Kentucky Constitution at the time of ratification.  This finding recognized that, historically, persons convicted of felonies were punished quite severely at common law; natural rights, including those to life and property, were stripped entirely.  Upon this, academics had concluded convicted felons, historically, simply did not possess the natural right to bear arms:

> Historically, convicted felons were . . . accorded diminished status when it came to being endowed with certain natural rights.
>
> Indeed, the view prevailing at the time our modern constitution was formulated was that felons were not endowed with the natural right to possess firearms.  *See* [*United States v. Emerson*, 270 F.3d 203, 262 (5th Cir.

2001), *abrogated by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024);] *State v. Hirsch*, 177 Or.App. 441, 34 P.3d 1209, 1212 (2001) ("Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death.") (quoting Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L.Rev. 204, 266 (1983)); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461, 480 (1995) (reporting that felons did not historically possess a right to possess arms). Thus, without further evidence to suggest that convicted felons were somehow accorded more status by the 1890 constitutional convention than was historically attributed to them, we cannot say that the use of the word "men" within our modern constitution was intended to necessarily encompass those men who were convicted felons.

*Posey*, 185 S.W.3d at 178.

The majority opinion in *Posey* returned to *Hirsch* during a discussion

of the "virtuous person" theory:

In fact, the concept of an individual right to bear arms sprung from classical republican ideology which required the individual holding that right to maintain a certain degree of civic virtue. *Hirsch*, *supra*, at 1211 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp Probs 143, 146 (Winter 1986)) (footnote omitted); *see also* Saul Cornell and Nathan DeDino, *The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives*, 73 Fordham L.Rev. 487, 492 (2004) ("Historians have long recognized that the Second Amendment [of the U.S. Constitution] was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue."). "One

implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) or those, who, like children or the mentally unbalanced, are deemed incapable of virtue." *Hirsch*, *supra*, at 1212, *see also* Debates, pg. 764 ("We are not freemen because we are licensed to do as we please, we are freemen because we are licensed to do what is right according to the law.") (Rodes, Robert). This concept of civic virtue is similarly reflected in other provisions contained in Section 1 of our Constitution, such as the rights of all persons to life, liberty, and the pursuit of happiness. Yet, neither party would claim that these rights are absolute or somehow immune from reasonable limitations in the interest of public safety and welfare. *See* Robert M. Ireland, *The Kentucky State Constitution, A Reference Guide* 25 (1999) (commenting that Section 1 "is by no means an unlimited repository of rights against government regulation or judicial mandate" and citing to several decisions which uphold reasonable limitations on the rights contained within Section 1).

*Posey*, 185 S.W.3d at 179-80.

The concurrence in *Posey* considered the historical concept of the right to bear arms near the time of the Founding in further detail. *Id*. at 182-83. A dissent in part by Justice Scott did so as well and extensively. With a focus upon the expansion of the number of felonies in the modern age, it argued that the current scope of convicted felons included persons who would not have been considered dangerous at the time the Kentucky Constitution was both originally drafted and at the time of ratification. *Id*. at 184-204.

*Posey* predated *Heller*. However, the Kentucky Supreme Court again considered a challenge to the Commonwealth's felon-in-possession statute in the wake of both *Heller* and *McDonald* in an unpublished case.[6] Despite the developments in Second Amendment jurisprudence, the majority opinion gave no indication that recent developments prompted it to give pause as to whether its prior decisions in *Eary* or *Posey* merited reconsideration. Instead, the Court emphasized the importance of *stare decisis* to assure our law "'develop[ed] in a principled and intelligible fashion' rather than 'merely chang[ing] erratically.'"[7]

Significant to arguments in this case, the unpublished opinion of the Kentucky Supreme Court also featured a concurrence from Justice Scott who revisited his dissenting opinion in *Posey* and commented upon developments in federal courts following *Heller*:

> As noted in my dissent in *Posey*, "[i]t is simply wrong to arrest, charge and convict Kentuckians of 'felony crimes' for [having] a weapon . . . without any evidence the weapon was intended to be used for unlawful purposes." 185 S.W.3d 170, 183 (Ky.2006) (Scott, J., concurring in part and dissenting in part). "Such a practice violates all of our rights to 'bear arms in defense of [ourselves and others]' and our rights of self-defense." *Id*. (citing Ky Const. § 1 (1, 7)).

---

[6] *Mucker v. Commonwealth*, No. 2010-SC-000009-MR, 2011 WL 1103359, at *1 (Ky. Mar. 24, 2011).

[7] *Mucker*, 2011 WL 1103359, at *2 (quoting *Chestnut v. Commonwealth*, 250 S.W.3d 288, 295 (Ky. 2008)).

-23-

> I am not alone in my viewpoint that some nonviolent felons may retain their right to keep weapons. For instance, a recent federal court of appeals decision suggested that a non-violent felon might prevail in an "as-applied" challenge to a felon-in-possession prohibition[.[8]]

Extensive consultation with the historical record near the time of the Founding was prominent in the Kentucky Supreme Court's discussion in *Posey* which led it to conclude that KRS 527.040 does not unduly infringe on the individual right to bear arms. Consultation with the historical record is a critical component to the analysis articulated in *Bruen*. However, and at the risk of extending this already lengthy opinion, examination of *Bruen*'s effects on *Posey* necessarily prompts our brief summary of recent Second Amendment jurisprudence in the United States Supreme Court.

The Second Amendment to the United States Constitution provides that:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. Amend. 2.

There can be little dispute that a sea change in the analysis of Second Amendment challenges for federal courts occurred when the pre-existing

---

[8] *Mucker*, 2011 WL 1103359, at *6-7 (Scott, J., concurring in result only) (citing *United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010) (O'Connor, J., sitting by designation)).

-24-

individual right to keep and bear arms was explicitly recognized and explained in *Heller*, 554 U.S. 570, 128 S. Ct. 2783. In *Heller*, the District of Columbia had made it a crime to carry an unregistered firearm, and simultaneously prohibited the registration of handguns. 554 U.S. at 574-75, 128 S. Ct. at 2788 (citing D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001)). In addition, no person could carry a handgun without a license, "but the chief of police may issue licenses for 1-year periods." 554 U.S. at 575, 128 S. Ct. at 2788 (citing DC Code §§ 22-4504(a), 22-4506). Furthermore, any lawfully owned firearms, for example registered hunting rifles, were required to be "unloaded and dissembled or bound by a trigger lock or similar device" aside from when they were located in a place of business or being used for lawful recreational activities. *Id*. (citing DC Code § 7-2507.02.1).

The petitioner in *Heller* was "a D.C. special police officer authorized to carry a handgun while on duty" in the city but whose application for a license to carry a handgun that he wished to keep at his home was refused. *Id*. Heller filed a civil action "to enjoin the city from enforcing the bar on the registration of handguns, the licensing requirement insofar as it prohibits the carrying of a firearm in the home without a license, and the trigger-lock requirement insofar as it prohibits the use of 'functional firearms within the home.'" *Id*. at 575, 128 S. Ct. at 2788. Ultimately, these facts before it prompted the *Heller* Court's conclusion that

the Second Amendment "protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home[.]"  554 U.S. at 577, 128 S. Ct. at 2789.

The petitioners in *McDonald v. City of Chicago, Illinois*, were "Chicago residents who [wanted] to keep handguns in their homes for self-defense but [were] prohibited from doing so by Chicago's firearms laws."  561 U.S. 742, 750, 130 S. Ct. 3020, 3025, 177 L. Ed. 2d 894 (2010).  Agreeing that the petitioners' constitutional right to keep and bear arms for the purpose of self-defense had been unduly infringed, the Court in *McDonald* made clear that the Second Amendment is applicable to states by way of the Due Process Clause of the Fourteenth Amendment.  *Id*.

Prior to *Heller*, federal courts' analysis of the Second Amendment had frequently occurred in the context of a militia-based rationale for which frequent citations were made to the United States Supreme Court's opinion in *United States v. Miller*, 307 U.S. 174, 59 S. Ct. 819, 83 L. Ed. 1206 (1939).  Recognizing the initial sea change to these courts' analysis it had announced, the *Heller* Court also made clear that "the right secured by the Second Amendment is not unlimited." 554 U.S. at 626, 128 S. Ct. at 2816.  While the Court carefully noted it had not "undertake[n] an exhaustive historical analysis . . . of the full scope of the Second

Amendment," it offered the assurance that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id.*, 128 S. Ct. at 2816-17. Such prohibitions, in a footnote, were described as "presumptively lawful regulatory measures." *Id.* at 627 n.26, 128 S. Ct. at 2817 n.26. When it had the subject in *McDonald*, the Court had seen fit to "repeat [its] assurances" that felon dispossession laws were presumptively valid. 561 U.S. at 786, 130 S. Ct. at 3047, 177 L. Ed. 2d 894.

In *Bruen*, it was "undisputed that petitioners [were] ordinary, law-abiding, adult citizens [whose] . . . proposed course of conduct [was to carry] handguns publicly for self-defense." 597 U.S. at 31-32, 142 S. Ct. at 2134. They challenged New York law where lower courts had determined the statutory "proper cause" requirement to obtain an unrestricted license to carry a concealed handgun was met only upon demonstration of "a special need for self-protection distinguishable from that of the general community." *Bruen*, 597 U.S. at 12, 142 S. Ct. at 2123 (citing *In re Klenosky*, 75 App.Div.2d 793, 428 N.Y.S.2d 256, 257 (1980)). The lower courts had approved this requirement to demonstrate a "special need" upon a determination it was "substantially related to the achievement of an important governmental interest." *Bruen*, 597 U.S. at 17, 142 S. Ct. at 2125.

The *Bruen* Court noted that the deference to the government in the lower courts was consistent with a pattern which had emerged among federal

courts of appeals in the wake of *Heller* and *McDonald* where a "two-step" framework was utilized when analyzing Second Amendment challenges. *Bruen*, 597 U.S. at 17, 142 S. Ct. at 2125. Typically, in the initial step, the government had opportunity to establish constitutionality by demonstrating that the regulated activity was "outside the scope of the right as originally understood." *Id*. at 18, 142 S. Ct. at 2126 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). If, however, a court determined the challenged law *was* within that scope, it typically proceeded to the second step—subjecting the challenged law to application of a means-end scrutiny. *Id*.

*Bruen* concluded that it was at this juncture the lower courts' framework had veered from the course which had been required by *Heller*. The problem was not within the initial step; the majority in *Bruen* assessed this as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 19, 142 S. Ct. at 2127. However, as to the lower courts' application of a means-end scrutiny, the Court's conclusion was the opposite. Such a test was incompatible with *Heller*, which had not only "decline[d] to engage in means-end scrutiny generally, but [had] also specifically ruled out the intermediate-scrutiny test." *Id*. at 23, 142 S. Ct. at 2129.

"*Heller*'s methodology centered on constitutional text and history." *Id*. at 22, 142 S. Ct. at 2128-29. The lower courts' second step, the majority

-28-

opinion concluded, had deviated from this and represented "one step too many."

*Id*. at 19, 142 S. Ct. at 2127. Going forward, *Bruen* dictated that courts must

evaluate Second Amendment challenges as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24, 142 S. Ct. at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S.

36, 51 n.10, 81 S. Ct. 997, 1007 n.10, 6 L. Ed. 2d 105 (1961)).

This framework announced by the *Bruen* Court might be broken down

as requiring a court to make two successive determinations when confronted with a

constitutional challenge. A court first determines whether "the Second

Amendment's plain text covers an individual's conduct[.]" *Bruen*, 597 U.S. at 24,

142 S. Ct. at 2129-30. Where it *does* cover the individual's conduct, it is

presumptively protected by the Second Amendment. Where the conduct is

presumptively protected, the court must proceed to evaluation of whether the

government has demonstrated the challenged regulation is "consistent with the

Nation's historical tradition of firearm regulation." *Id*. at 24, 142 S. Ct. at 2130.

Where a court determines that the government has met this burden, it has likewise

determined that the individual's conduct falls outside of the scope of the Second Amendment's protection. *Id.*

In the *Bruen* opinion's own demonstration of the constitutional standard by application to the challenged law, a pair of inquiries—whether the challenger is one of "the people" given protection by the Second Amendment and whether the firearm at issue is contemporarily in common use for self-defense—appear to be relevant to the first step:

> It is undisputed that petitioners . . . —two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. *See Heller*, 554 U.S. at 580, 128 S. Ct. 2783. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. *See id.*, at 627, 128 S. Ct. 2783; *see also* [*Caetano v. Massachusetts*, 577 U.S. 411, 411-12, 136 S. Ct. 1027, 1027-28, 194 L. Ed. 2d 99 (2016)]. We therefore turn to whether the plain text of the Second Amendment protects [petitioners'] proposed course of conduct—carrying handguns publicly for self-defense.

*Bruen*, 597 U.S. at 31-32, 142 S. Ct. at 2134.

Following the "textual" analysis, if a court finds a course of conduct which is covered by the text of the Second Amendment, it must then determine whether the government has met its burden and "affirmatively prov[en] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19, 142 S. Ct. at 2127. A challenger must prevail under both prongs to be successful.

-30-

*Bruen* was a relatively recent decision at the time the Order here issued. However, it did not issue at the very dawn of *Bruen*'s announcement. The opinion in *Bruen* was issued in June of 2022. *Bruen*, *supra*. The Order of the trial court was issued in March of 2024. By that time, a number of federal circuits had examined the manner in which district courts were addressing challenges to the federal felon-in-possession statute subsequent to *Bruen*. No federal circuit court had determined that a facial challenge to the federal felon-in-possession statute succeeded. However, considerable variance as to the application of the analysis articulated in *Bruen* can be surveyed.

The variations in federal circuits' application of *Bruen*'s analysis to the federal felon-in-possession statute have proven most significant to the inquiry of whether the statute is susceptible to an as-applied challenge. A split among the circuits on this issue had already begun to emerge following *Heller*. However, the opinion in *Bruen* has prompted more consideration of the question. Following *Heller*, but prior to *Bruen*, the Sixth Circuit's decisions on the federal felon-in-possession statute had "omitted any historical analysis" and "simply relied on *Heller*'s one-off reference to felon-in-possession statutes." *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024).

The *Williams* Court determined this rendered its own Sixth Circuit precedents "inconsistent with *Bruen*'s mandate to consult historical analogs." *Id.*

Furthermore, the Court commented, these precedents had been also inconsistent with "*Heller* itself, which stated courts would need to 'expound upon the historical justifications' for firearm-possession restrictions when the need arose." *Id*. (quoting *Heller*, 554 U.S. at 635, 128 S. Ct. at 2821). The *Williams* Court rejected the government's argument that the "virtuous person" theory served to illustrate the defendant was not among "the people" to whom the Second Amendment applied and concluded that the historical origins of the right to bear arms sprung instead from "the individual's ability to defend himself." *Williams*, 113 F.4th at 647 (citing *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting)).

Concluding it was now obligated to expound upon those historical justifications, the *Williams* Court commenced an historical analysis, finding it appropriate to begin in pre-Founding England. 113 F.4th at 650 (citing *Heller*, 554 U.S. at 592, 128 S. Ct. at 2797, and *Bruen*, 597 U.S. at 20, 142 S. Ct. 2127). After a summary of English history, the *Williams* Court emphasized actions by "[t]he English Crown and Parliament alike [that] forbade individuals from possessing weapons if their possession of those weapons threatened the general public[,]" as well as "generalized determinations of dangerousness" which had been made by Parliament when restricting certain groups of people from possession of weapons that "even individuals in a broad group—like Catholics—could keep arms if they could demonstrate they didn't pose a danger." *Williams*, 113 F.4th at 651-52.

-32-

The *Williams* Court found similar patterns in colonial America and focused upon discriminatory laws which had categorically banned persons from possessing firearms on the basis of their race or religion. *Id.* at 652-57. Its historical analysis led the Sixth Circuit to conclude:

> This historical study reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous. Such populations, the logic went, posed a fundamental threat to peace and thus had to be kept away from arms. For that reason, governments labeled whole classes as presumptively dangerous. This evaluation was not always elegant. And even though some of those classifications would offend both modern mores and our current Constitution, there is no doubt that governments have made such determinations for centuries. Each time, however, individuals could demonstrate that their particular possession of a weapon posed no danger to peace.

*Williams*, 113 F.4th at 657.

Nonetheless, regarding the facial challenge to the felon-in-possession statute, the Sixth Circuit determined that the defendant was required to show that there exists "no set of circumstances under which the Act would be valid." *Id.* (quoting *Salerno*, 481 U.S. at 745, 107 S. Ct. at 2100). The defendant could not do so because "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous" and the felon-in-possession statute was "an attempt to do just that." *Williams*, 113 F.4th at 657.

Furthermore, since the Court had determined that "most applications of [the felon-in-possession statute] are constitutional, the provision is not susceptible to a facial challenge." *Williams*, 113 F.4th at 657. However, as to the matter of the statute's susceptibility to an as-applied challenge, the Sixth Circuit deemed this a more complex matter. Although the defendant's as-applied challenge was also rejected, the *Williams* Court left open the possibility that there could be a successful challenge where a defendant could "prove they aren't dangerous in order to regain their right to possess arms." *Id*. at 662. This was consistent with our "nation's history [which] shows that the government may require individuals in a disarmed class to prove they aren't dangerous in order to regain their right to possess arms." *Id*. at 662.

The debate regarding the "virtuous person" theory and the conceptual origins of an individual right to bear arms appeared in challenges to the federal felon in possession statute prior to *Bruen*. Furthermore, some federal circuits concluded that *Bruen* did not require any reevaluation of their precedent on the constitutionality of the felon-in-possession statute. A recent Fourth Circuit opinion determined that the paths to rejection of a facial challenge are now so worn it is unnecessary to identify which is taken. *United States v. Canada*, 123 F.4th 159, 161-62 (4th Cir. 2024). The opinion provides a concise summary of some general federal circuit approaches to facial challenges following *Bruen*:

We . . . need not—and thus do not—resolve whether [the felon-in-possession statute]'s constitutionality turns on the definition of the "people" at step one of *Bruen*, a history and tradition of disarming dangerous people considered at step two of *Bruen*, or the Supreme Court's repeated references to "longstanding" and "presumptively lawful" prohibitions "on the possession of firearms by felons." *See*, e.g., *Rahimi*, 144 S. Ct. at 1902; *Bruen*, 597 U.S. at 9, 38 n.9, 142 S. Ct. 2111; *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). We likewise do not decide whether *Bruen* or *Rahimi* sufficiently unsettled the law in this area to free us from our otherwise-absolute obligation to follow this Court's post-*Heller* but pre-*Bruen* and pre-*Rahimi* holdings rejecting constitutional challenges to this same statute. *See, e.g.*, *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012).

No matter which analytical path we choose, they all lead to the same destination: Section 922(g)(1) is facially constitutional because it "has a plainly legitimate sweep" and may constitutionally be applied in at least some "set of circumstances." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008) (quotation marks removed). Take people who have been convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States. *See* 18 U.S.C. §§ 36, 2119, 2113, 1751(a). Whether the proper analysis focuses on the definition of the "people," the history of disarming those who threaten the public safety, the Supreme Court's repeated assurances about "longstanding" and "presumptively lawful" prohibitions on felons possessing firearms, or circuit precedent, the answer remains the same: the government may constitutionally forbid people who have been found guilty of such acts from continuing to possess firearms. That ends this facial challenge.

*Canada*, 123 F.4th at 161-62.

**Trial Court Erred By Failing To Recognize The Presumptive Facial Constitutionality of KRS 527.040**

The Commonwealth argues that, to decide this case, we need look no further than the explicit statements from the United States Supreme Court regarding the constitutionality of felon-in-possession laws. Such laws, the Commonwealth argues, have been consistently at or near the forefront of any firearms regulations which have been identified as presumptively lawful. To be sure, the *Heller* Court expressly admonished that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" 554 U.S. at 626, 128 S. Ct. at 2816-17. Moreover, in *McDonald*, the Court highlighted that "[w]e made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons" and emphasized that "[w]e repeat those assurances here." 561 U.S. at 786, 130 S. Ct. at 3047.

Unlike *McDonald* and *Heller*, the majority opinion in *Bruen* did not explicitly restate any "assurance" regarding the presumptive lawfulness of felon-in-possession laws. Both Frazier and the Order from the trial court place momentous significance upon this absence. However, even the dissenters did not anticipate that the majority's opinion in *Bruen* would lead to the obliteration of felon-in-possession laws. Indeed, *Bruen* featured an extensive dissent which

criticized what it characterized as an "unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning." *Bruen*, 597 U.S. at 130, 142 S. Ct. at 2189, 213 L. Ed. 2d 387 (Breyer, J., dissenting, joined by Sotomayor, J., & Kagan, J.). Writing for three Justices, the dissent referenced four types of firearms regulations referenced in *Heller* as "presumptively lawful" and noted that no precise corollaries for these laws existed prior to the twentieth century. *Id.* at 129, 142 S. Ct. at 2189, 213 L. Ed. 2d 387. Nevertheless, the dissent "underst[ood] the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding." *Id.*

The Commonwealth argued this established that *Bruen* had not disturbed the presumption of felon-in-possession laws' constitutionality and that Frazier's facial challenge should be denied on these grounds alone. The trial court order rejected this argument, reasoning that "[t]he majority opinion in *Bruen* makes no mention of *Heller*'s reference to felon in possession laws" but "[i]nstead the admonition appeared in a concurring opinion."

The trial court further reasoned that, even if the presumptions in *Heller* remained valid following *Bruen*, *Heller* still did not relieve trial courts from conducting a full constitutional analysis:

> [a]s stated by the Sixth Circuit in *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686 (6th Cir. 2016) . . . regarding the federal felon in possession of a firearm statute [*sic*], Section 922(g)(4), "*Heller* only established a

-37-

presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis." Thus, it is necessary to continue on to *Bruen*'s historical analysis.

The Order mistakenly references 18 U.S.C. § 922(g)(4), the federal statute examined for constitutionality in the pre-*Bruen* case *Hillsdale County Sheriff's Department*, 837 F. 3d 678, as the federal felon-in-possession statute. Rather, 18 U.S.C. § 922(g)(4) prohibits anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing a firearm. Still, the Sixth Circuit *did* consider the presumptive constitutionality of 18 U.S.C. § 922(g)(4) in *Hillsdale County Sheriff's Department*, in light of the admonition that "nothing in [the *Heller*] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" 837 F.3d at 686 (quoting *Heller*, 554 U.S. at 626, 128 S. Ct. at 2816-17).

However, most pertinent to this case, the *Hillsdale County Sheriff's Department* opinion did not conclude that full constitutional analysis was required as a result of a *facial* challenge to a regulation that *Heller* had specifically designated as presumptively constitutional. Instead, the "analytical off-ramp" referenced in *Hillsdale County Sheriff's Department* occurred during a discussion of whether 18 U.S.C. § 922(g)(4) might eventually be susceptible to an *as-applied*

challenge. The language quoted by the trial court occurs during the following passage:

> *Heller* does not resolve this case on its own terms. While we "are obligated to follow Supreme Court *dicta*," *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted), *Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis. A presumption implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny in challenge to § 922(g)(1)); [*United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)] ("[T]he phrase 'presumptively lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'" (quoting *Williams*, 616 F.3d at 692)). We do not take *Heller*'s "presumptively lawful" dictum to foreclose § 922(g)(4) from constitutional scrutiny.

*Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d at 686-87.

We cite to *Hillsdale County Sheriff's Department* not for precedential or persuasive value to our decision in this case. We quote *Hillsdale County Sheriff's Department* to illustrate that it provided little substantive support for the trial court's conclusion that it was compelled to conduct an historical analysis pursuant to *Bruen* on a *facial* challenge to the constitutionality of Kentucky's felon-in-possession statute.

-39-

Without pointing to anything specific in the majority opinion of *Bruen* which rejected the explicit presumption in *Heller*, or was even in direct conflict with it, the trial court essentially found *Bruen* had overruled or abrogated Kentucky's felon-in-possession statute. The Commonwealth argues that this was error and posits the subsequent opinion of the United States Supreme Court in *Rahimi* provides further support that the explicit presumption in *Heller* was never abandoned. *See Rahimi*, 602 U.S. at 699, 149 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26, 128 S. Ct. at 2817) ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'").

Conversely, Frazier argues *Rahimi* provides further support for the Order and the dismissal of his case. He argues *Rahimi* found the constitutionality of 18 U.S.C. § 922(g)(8) turned on a court having made a specific finding that a defendant represents a credible threat to the physical safety of another. The opinion does discuss this aspect of Rahimi having been disarmed, because he was subject to a domestic violence order. *Rahimi*, 602 U.S. at 698-99, 144 S. Ct. at 1901-02. However, at the very same juncture, the *Rahimi* Court was careful to admonish that it was "not suggest[ing] that the Second Amendment prohibits the

-40-

enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]"  The Court further made specific citation to the page containing *Heller*'s presumption of constitutionality, including felon-in-possession laws.  *Rahimi*, 602 U.S. at 698-99, 144 S. Ct. at 1901-02 (citing *Heller*, 554 U.S. at 626, 128 S. Ct. at 2816).  Furthermore, the *Rahimi* Court admonished that while *Heller* **had** "invalidated an absolute prohibition of handguns . . . in the home[,]" the decision **had not**:

> established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home.  In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful."

*Rahimi*, 602 U.S. at 699, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26, 128 S. Ct. at 2817).

We agree with the Commonwealth that *Heller* and its progeny establish that, as to facial challenges, felon-in-possession statutes are presumptively constitutional.  This is consistent with federal circuit courts who have determined that neither *Bruen* nor *Rahimi* abrogated precedent which held 18 U.S.C. § 922(g)(1) facially constitutional based on the continued vitality of the assurances of presumptive constitutionality in *Heller* and *McDonald*.  *See United States v. Duarte*, 137 F.4th 743, 749-53 (9th Cir. 2025) (en banc); *Vincent v.*

-41-

*Bondi*, 127 F.4th 1263, 1264-66 (10th Cir. 2025); *United States v. Hunt*, 123 F.4th 697, 703-04 (4th Cir. 2024).

Unlike the Sixth Circuit in the wake of *Bruen*, who found no precedent among its own opinions on the right to bear arms which had conducted an historical analysis, we and the trial court are required to look to the precedent of the Kentucky Supreme Court. And we conclude the Kentucky Supreme Court had already provided an extensive historical analysis demonstrating a history of the legislature disarming persons it considered dangerous. Furthermore, it substantively affirmed that KRS 527.040 was consistent with the Nation's tradition of firearms regulation. As to the only issue before the trial court, whether KRS 527.040 could be constitutional in some instances, we conclude the presumption of constitutionality for felon-in-possession laws in the United States Supreme Court opinions leaves *Posey* still viable and binding precedent. The trial court erred when finding the presumption in favor of the constitutionality of felon-in-possession laws expressed in *Heller* was insufficient to overcome a facial challenge to KRS 527.040.

**The Trial Court Erred When Conducting the *Bruen* Analysis**

The Commonwealth cited to a federal district court's opinion examining a challenge to the federal felon-in-possession statute very shortly after the *Bruen* opinion had issued, *United States v. Coombes*, 629 F. Supp. 3d 1149

(N.D. Okla. 2022).  The Commonwealth pointed to that opinion's description of

attainder statutes which deprived persons of various rights, including the right to

bear arms around the time of the Founding.  Parallels, not only with aspects of the

historical discussion in *Posey* but also with the specific sources cited, are

immediately apparent in *Coombes*:

> "[I]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'" Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (quoting Don B. Kates Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also* Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (internal footnotes omitted) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right.  Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); *Binderup v. Attorney General*, 836 F.3d 336, 348-49 (3d Cir. 2016); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (suggesting that the Second Amendment was limited to "virtuous" persons).  In colonial New York, the "disaffected" were "guilty of a breach of the General Association" and outside of protection of "all the blessings resulting from that liberty which they in the day of trial had abandoned, and in defen[s]e of which many of their *more virtuous* neighbors and countrymen had nobly died."  [Henry Onderdonk, Jr., Documents and Letters Intended to Illustrate the Revolutionary Incidents of Queens County with Connecting Narratives, Explanatory Notes, and Additions, 42-44 (1846)] (emphasis added).  Thus, colonial bills of

> attainder indicate that "the founders conceived of the right to bear arms as belonging only to virtuous citizens." *Kanter*, 919 F.3d at 446.

*Coombes*, 629 F. Supp. 3d at 1157-58.

The Order stated that the Commonwealth had argued felons were not subject to *Bruen*'s historical analysis because they were not persons intended to be covered by the Second Amendment. The trial court spent a considerable portion of the Order considering the idea that the right to bear arms was conceptually tied to a virtuousness requirement at the time of the Founding. The Order asserted that proponents of the idea tended to tie the right to bear arms in with civic rights, such as the right to vote. The trial court recognized "the Kentucky Supreme Court supports this argument" and it cited to the statement in *Posey* that: "[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those, who, like children or the mentally unbalanced, are deemed incapable of virtue." Order, page 4 (quoting *Posey*, 185 S.W.3d at 180). However, the Order indicated the trial court was "not convinced that the constitutional right to bear arms *should* be premised upon a virtue requirement." (Emphasis added.)

In support of its reluctance to credit the statement in *Heller*, that felon-in-possession laws remain presumptively valid after *Bruen*, the Order relied on *United States v. Goins*, 647 F. Supp. 3d 538, 543 (E.D. Ky. 2022) (hereinafter

"*Goins I*").[9]  *Goins I* determined that *Bruen* had "diminishe[d] the persuasiveness" of the "admonitions" in *McDonald* and *Heller* concerning the presumptive validity of felon-in-possession laws.  *Goins I*, 647 F. Supp. 3d at 542.

An important distinction is made within the *Goins I* opinion to distinguish it from what was recognized as binding precedent in *United States v. Khami*, 362 F. App'x 501 (6th Cir. 2010).  *Khami* **had** found that the *Heller* admonition itself was "sufficient to dispose of the claim that § 922(g)(1) is unconstitutional."  *Id*. at 507.  However, the district court in *Goins I* determined the question before it was distinct from the challenge presented in *Khami* because it faced "an *as applied* challenge to felon in possession laws rather than a facial one." *Goins I*, 647 F. Supp. 3d at 543 (emphasis added).  Furthermore, *Goins I* determined that, although the as-applied challenge necessitated extensive historical analysis, the as-applied challenge still failed.  Following extensive historical discussion, the *Goins I* opinion concluded that:

> [s]imply put, the history and tradition relevant to the
> Second Amendment support Congress's power to disarm
> those that it deems dangerous.  Congress can base the
> decision to disarm a class of people upon modern
> judgments as to the categories of people whose
> possession of guns would endanger the public safety[.]

647 F. Supp. 3d at 554 (internal quotation marks and citation omitted).

---

[9] *Goins I* was affirmed at 118 F.4th 974 (6th Cir. 2024).

Later faced with an appeal of *Goins I*, the Sixth Circuit upheld the district court's determination that 18 U.S.C. § 922(g)(1) was constitutional as both a facial and as-applied challenge. *United States v. Goins*, 118 F.4th 794, 798 (6th Cir. 2024) ("*Goins II*") (citing *Williams*, 113 F.4th 637). As discussed above, the Sixth Circuit has stated that 18 U.S.C. § 922(g)(1) "might be susceptible to . . . as-applied challenge[s] in certain cases" and has left open the possibility that federal defendants might pursue an individualized exception to the statute in that Circuit. *Williams*, 113 F.4th at 657.

However, when describing those hypothetical "certain cases", the Sixth Circuit was clear—reviewing courts "must focus on each individual's specific characteristics" which "necessarily requires considering the individual's entire criminal record" and to evaluate for "certain categories of past convictions" which "are highly probative of dangerousness, while others are less so." *Id*.

Here, the trial court specifically declined for the court record to be supplemented with Frazier's criminal record. This indicated, expressly or not, a decision to evaluate Frazier's constitutional challenge to KRS 527.040 facially. Much of the discussion in the Order might have had relevance to a question of whether KRS 527.040 is susceptible to an as-applied challenge. However, such a question was not before the trial court. The caselaw cited in the Order provided no

-46-

substantive support for the trial court's decision to reject the historical analysis in *Posey* and proceed to its own.

Moreover, the trial court erred when conducting the analysis articulated in *Bruen*. *Bruen* indicates that a court faced with a Second Amendment challenge examines whether the challenger is "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580, 128 S. Ct. 2790-91). Where it is in dispute, the court examines whether the firearms in question "are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 31-32, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 627, 128 S. Ct. at 2817; and *Caetano*, 577 U.S. at 411-12, 136 S. Ct. at 1027). Where these are established, a court turns to the plain text of the Second Amendment to evaluate whether the challenger's proposed course of conduct is within its scope. *Bruen*, 597 U.S. at 32, 142 S. Ct. at 2134. Where the conduct is covered, the court then examines whether the challenged regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 33, 142 S. Ct. at 2135.

### The Trial Court Erred in Analyzing KRS 527.040 Under The Analysis Articulated in *Bruen*

The Commonwealth argues that, even if Frazier's facial challenge required the trial court to conduct the historical analysis articulated in *Bruen*, the

-47-

trial court erred because KRS 527.040 is consistent with the Nation's history and tradition of regulating firearms. We agree.

One approach that affirms the facial constitutionality of felon-in-possession laws occurs in the question articulated in *Bruen*—whether the challenger is one of "the people" in the text of the Second Amendment to whom it applies. *Bruen*, 597 U.S. at 31-32, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580, 128 S. Ct. at 2791). As the Court in *Heller* observed, "[t]he people' seems to have been a term of art employed in select parts of the Constitution[,] . . . refer[ring] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 580, 128 S. Ct. at 2791.

There is a question then as to whether convicted felons are part of the political community referenced in *Heller*. The *Posey* Court reasoned that convicted felons were not among the persons included within the scope of the right to bear arms at the time the right was first recognized and then later ratified in the Kentucky Constitution. This might arguably be viewed as correlating to a determination that a convicted felon is not among the political community of "the people" to which the text of the Second Amendment refers. Arguably, this would be in keeping with the consistent descriptions within the *Bruen* opinion of the Second Amendment Right as applying to law-abiding people. *See Bruen*, 597 U.S.

-48-

at 8-10, 142 S. Ct. at 2122. Some courts have concluded that this renders convicted felons outside of the scope of "the people" to whom Second Amendment protection articulated in *Bruen* is applicable. *See Washington v. Bonaparte*, 32 Wash. App. 2d 266, 279, 554 P.3d 1245, 1251-52 (2024), *review denied*, 4 Wash. 3d 1019, 566 P.3d 98 (2025) ("As the unlawful possession of a firearm statute [in Washington state] does not burden a law-abiding citizen's right to keep and bear arms and Bonaparte is a convicted felon, the 'historical tradition' framework articulated in [*Bruen*] is not applicable to his challenge.").

The trial court Order focused upon such implications and seemingly concluded that reference to the "virtuous citizen" theory wrongfully leads to a conclusion that convicted felons are not among "the people." However, *Posey* recognized the right to bear arms as a natural right which was to be distinguished from rights conveyed by the government to its citizens. This is largely consistent with the majority of courts which have determined that convicted felons remain within "the people" to whom the Second Amendment applies. It is notable that the "lack of consensus" among federal circuits as to whether felon-in-possession are susceptible to as-applied challenges typically "stems from analysis of the second prong of the *Bruen* test." *Ginevan v. Commonwealth*, 83 Va. App. 1, 19, 909 S.E.2d 581, 590 (2024).

Other courts who have determined that the "concept of virtuous citizenry" is consonant with the repeated references in *Heller* and *Bruen* to the Second Amendment protecting the possession of firearms by "law-abiding" citizens. And additionally, these courts have concluded, "the weight of tradition and history shows that the framers of the constitution would have understood that those who commit felonies would not fall within the protections of the Second Amendment" have nonetheless determined that "the Second Amendment's plain text covers defendant's possession of a firearm." *Parras*, 326 Or. App. at 255-57; *see also Duarte*, 137 F.4th at 752-55. We cannot presume that adherence to the *Posey* analysis or endorsement of the "virtuous person" theory mandates a conclusion that convicted felons are outside of the protection of the Second Amendment.

We are also aware of caselaw predating *Bruen* detailing an historical debate regarding the relationship between the right to bear arms and a virtuousness requirement. Some jurists have maintained that the "historical evidence is inconclusive at best." *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 915-20 (3d Cir. 2020) (Bibas, J., dissenting) (criticizing the historical foundation for the theory that the right to keep and bear arms was limited to those who are virtuous).

In keeping with other caselaw and law review articles examining *Bruen*, the Order cited to a dissenting opinion by then-Judge Amy Coney Barrett which was critical of the idea that the right to bear arms had conceptual origins associated with a virtuousness requirement. *Kanter*, 919 F.3d at 462. The trial court here relied upon this dissent to reject any precedential obligation to follow or give deference to the Kentucky Supreme Court's opinion in *Posey*.

However, we find no support for the trial court's conclusion that KRS 527.040 is facially unconstitutional in the oft-cited dissent.

> At the outset, it is worth clarifying a conceptual point. There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.

*Kanter*, 919 F.3d at 451-52 (Barrett, J., dissenting) (internal quotation marks and citations omitted.)

While the *Kanter* dissent rejected the "virtuousness requirement" theory, and maintained that convicted felons were within the scope of the Second Amendment, the issue was pertinent only to an *as-applied* challenge to a felon-in-

-51-

possession charge, with a defendant alleging their specific criminal history did not demonstrate they were dangerous. Moreover, the trial court referenced this discussion to reject any precedential value in *Posey* because it found reference to the "virtuous person" theory indicated a failure to recognize the right to bear arms as any more than a civic right as discussed in the *Kanter* dissent. However, even to the extent that *Posey* might be said to endorse the "virtuous person" theory, the opinion simultaneously recognized and treated the right to bear arms as a natural right, as opposed to a civic one. *Posey*, 185 S.W.3d at 179.

Most importantly, a dissent in a Seventh Circuit case provided the trial court no precedential authority to disregard precedent of the Kentucky Supreme Court. The trial court was not required to reconcile an historical debate regarding the virtuousness requirement on the facial challenge before it. The trial court erred when determining that *Posey*'s references to the "virtuous person" conflict with the initial analysis articulated in *Bruen*.

Furthermore, the trial court erred in its analysis under *Bruen*'s second step when concluding the Commonwealth had not met its burden. The Commonwealth cited to caselaw containing an abundance of examples of historical analogues to KRS 527.040 sufficient to survive a facial challenge.

*Bruen*'s second step required the Commonwealth to establish that KRS 527.040 "is consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 597 U.S. at 24, 142 S. Ct. at 2130. However, if there had been room for doubt, *Rahimi* clarified that it is error to interpret *Bruen* as requiring the government to provide a "historical twin" to a challenged law from the founding era rather than a "historical analogue[.]" *Rahimi*, 602 U.S. at 701, 144 S. Ct. at 1903. Furthermore, *Rahimi* made clear that a court's role, where such a resolution might be found, is to render a decision which harmonizes legislation with the Constitution, rather than specifically searching for hypothetical conflict that might exacerbate a mere suggestion of discord into actual disarray:

> As we have said in other contexts, [w]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict. Rather than consider the circumstances in which [the facially challenged statute] was most likely to be constitutional, the panel instead focused on hypothetical scenarios where [the statute] might raise constitutional concerns. That error left the panel slaying a straw man.

*Rahimi*, 602 U.S. at 701, 144 S. Ct. at 1903 (internal quotation marks and citations omitted).

The Order here did not seek out harmonization between legislation and the Constitution when conducting the analysis from *Bruen*, as *Rahimi* emphasized is the court's role. Moreover, despite recognizing that *Bruen* required only "analogous" historical regulation, the Order concluded that the Commonwealth failed to meet its burden because it did not provide regulations from the time of the Founding which permanently disarmed persons based on

-53-

felony status.  This amounted to requiring the Commonwealth to provide an "historical twin" which, if there was any doubt, the *Rahimi* Court has made clear was not consistent with *Bruen*'s analysis.

"[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30, 142 S. Ct. at 2133.  Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

The federal statute which criminalizes possession of a firearm by a person subject to a domestic violence restraining order was found constitutional in *Rahimi* although the Court did not point to precise corollaries for such a regulation at the time of the Founding.  Instead, *Rahimi* cited to historical surety and "going armed" laws, which were used by courts to prevent and punish physical violence, as sufficiently analogous to the challenged statute.  This was sufficient to establish the challenged statute was consistent with the Second Amendment because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."  *Rahimi*, 602 U.S. at 700, 144 S. Ct. at 1902.

Ultimately, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692, 144 S. Ct. at 1898 (emphasis added).

The Commonwealth pointed out that historical punishments for convicted felonies included punishments more severe than disarmament. Indeed:

> [f]irst, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129, 139 S. Ct. 1112, 203 L. Ed. 2d 521 (2019) (citation omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 13, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). Likewise, "[c]olonies and states also routinely made use of estate forfeiture as punishment." *Diaz*, 116 F.4th at 468 (citing Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275 & 276 (2014) (collecting statutes)); *see also* [*Range v. Attorney General United States*, 124 F.4th 218, 267-71 (3d Cir. 2024)] (Krause, J., concurring) (collecting statutes). In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded." 4 William Blackstone, *Commentaries on the Laws of England 95* (1st ed. 1769). And these punishments were not limited to violent felonies, as "nonviolent crimes such as forgery and horse theft were capital offenses." [*Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)]; *see* Stuart Banner, *The Death Penalty: An American History 23* (2002) (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805); [*United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2708, 221 L. Ed. 2d 970 (2025)] (collecting laws that punished non-violent offenses with death and estate forfeiture). Indeed, in

> 1790, the First Congress made counterfeiting and forgery capital offenses. *See* Act of Apr. 30, 1790, ch. 9, § 14, 1 Stat. 112, 115.

*Duarte*, 137 F.4th at 756.

The Commonwealth pointed out that *Posey* documented the harsh penalties those convicted of felonies faced at the time of the Founding. Frazier argued there were only a few crimes which were considered felonies at the time of the founding. However, for purposes of a facial challenge, this was of little consequence. Some applications of KRS 527.040 would include disarming persons convicted of those crimes considered felonies at the founding. For the Commonwealth to prevail, it was only required to demonstrate the Commonwealth's felon-in-possession statute is compatible with the Second Amendment in *some* of its applications. *Rahimi*, 602 U.S. at 701, 144 S. Ct. at 1903. Conversely, Frazier's motion to dismiss should have been granted only if he demonstrated that KRS 527.040 is unconstitutional in *all* of its applications.

The central question presented here—whether Kentucky's felon-in-possession statute is facially constitutional—may be resolved by application of *Posey* without any conflict with *Heller*, *Bruen*, or *Rahimi*. Certainly, to the extent to which *Posey* relies upon a reasonable regulation standard or any scrutiny test in conflict with *Bruen* to reach its conclusion, it is abrogated. However, to the extent

that *Posey* found that KRS 527.040 was consistent with the principles of the Nation's tradition of firearms regulation, it is not in conflict with *Bruen*.

To the extent this is the case, this Court "is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court." SCR[10] 1.030(8)(a). We are without authority to overrule the established precedent set by the Supreme Court or its predecessor Court. *Smith v. Vilvarajah*, 57 S.W.3d 839, 841 (Ky. App. 2000). Only where precedents are factually or legally distinguishable from those in the current case may we consider the caselaw non-binding. *See Kindred Healthcare, Inc. v. Henson*, 481 S.W.3d 825, 829 (Ky. App. 2014).

Within the scope of a facial challenge to KRS 527.040—the only question we today consider—we detect no inherent contradiction between the analysis in *Posey* and the required analysis the Supreme Court of United States articulated in *Bruen* and *Rahimi*. Neither do we find that *Bruen* announced some rule concerning the theory of the "virtuous citizen" historical debate. The trial court's conclusion that the analysis in *Posey* is inconsistent with that required by *Bruen* is in no way proven by the Order's analysis. The number of appellate cases finding a virtuousness requirement subsequent to *Bruen* reinforces this. A debate

---

[10] Rules of the Kentucky Supreme Court.

among historians and academics as to a "virtuousness requirement" lends neither this Court, nor the trial court, license to ignore binding precedent.

Here, the trial court erred when it found KRS 527.040 unconstitutional on its face.

## CONCLUSION

For the foregoing reasons, the Order of the Jefferson Circuit Court is **reversed** and remanded with directions to reinstate the dismissed charges.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General

Sarah N. Christensen
Assistant Solicitor General

John H. Heyburn
Principal Deputy Solicitor General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Rob Eggert
Tricia F. Lister
Louisville, Kentucky